In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1599

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LORIE WESTERFIELD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 466 10—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED NOVEMBER 29, 2012—DECIDED APRIL 9, 2013

Before EASTERBROOK, *Chief Judge*, and POSNER and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* Lorie Westerfield was a lawyer working for a title insurance company in Illinois when she facilitated fraudulent real estate transfers in a mortgage fraud scheme. The scheme used stolen identities of homeowners to "sell" houses that were not for sale to fake buyers, and then collect the mortgage proceeds from lenders who were unaware of the fraud.

Westerfield facilitated five such real estate transfers, and was later indicted on four counts of wire fraud. She claimed that she had been unaware of the scheme's fraudulent nature and argued that she had merely performed the typical work of a title agent. A jury disagreed, and convicted her on three of the counts. On appeal, she challenges her conviction for insufficient evidence and argues that the district court improperly admitted a co-defendant's testimony during trial. Additionally, she challenges her sentence based on the district court's application of the U.S. Sentencing Guidelines and the district court's restitution calculation. We affirm.

## I. Facts

On June 11, 2008, Lorie Westerfield and eleven co-defendants were charged in a twenty-count indictment alleging that the defendants were involved in a scheme of mortgage fraud and identity theft. This scheme organized fraudulent real estate transactions in which individuals posing as home buyers would obtain mortgage proceeds without actually buying a home. Instead, the fake buyers would "purchase" a home from fake sellers who used the names of the homeowners of record when filling out the required paperwork. The real homeowners and the people whose names were used as proposed buyers on the paperwork were not involved in the scheme or even aware that their identities had been stolen. The mortgage lenders were also unaware that the scheme was fraudulent, and they unknowingly issued mortgage proceeds to finance the non-existent real estate transfers.

Freddie Johnson was a principal organizer of this scheme. He worked with other defendants to find home-owners whose identities could be stolen and who had homes that were unencumbered by liens. Other scheme participants then found names of people with good credit ratings whose identities could be used as buyers in the fraudulent transactions. Johnson then worked with mortgage brokers involved in the scheme, including a co-defendant named LeAndre Burnett, to draft fraudu-lent mortgage loan applications based on the stolen identities. These mortgage loan applications contained multiple fraudulent misrepresentations. The applica-tions misrepresented the buyers' names, incomes, assets, employment records, liabilities, and intended uses of the properties. They also did not disclose that the named buyers were seeking to purchase multiple pro-perties within the same time period. The fake buyers supported these applications with counterfeit and fraud-ulently obtained documents.

Once financing had been arranged for the fraudulent real estate transactions, Johnson recruited people—sometimes strangers off the street—to attend the real estate closings and sign various financing docu-ments. These fake buyers and sellers would not sign their real names, but would instead use stolen identities. A title agent would guide the fake buyers and sellers through these real estate closings, while a "closer" would supposedly monitor the closings on behalf of the mortgage lenders.

Westerfield was the title agent for five of the fraudulent transactions in this scheme. Westerfield was an attorney

licensed to practice in Illinois, and from September 2001 to December 2003, she worked as an independent contractor for Attorneys' Title Guaranty Fund, Inc., a title company that issued insurance policies for real estate closings. At trial, Johnson testified that he believed that Westerfield had become involved in the scheme through Burnett, who had been one of Westerfield's clients. He also stated that he had assumed that Burnett had informed Westerfield about the scheme's fraudulent activities because Burnett "was making a lot of money" through this scheme and needed "to have somebody to trust." But Burnett did not testify at trial, and the government did not provide any direct evidence showing that Westerfield knew that she was participating in fraudulent real estate transactions.

Westerfield's five real estate transactions were for two "buyers"—"Meghan Ross," who pretended to buy three homes, and "Eddie Robinson," who pretended to buy two homes. Westerfield served as both a title agent preparing the required paperwork and as an attorney purportedly representing the sellers. In her role as a title agent, Westerfield drafted the title commitments underlying the title insurance procured on behalf of the sellers. These commitments contained information about the buyer, the purchase price of the property, the lender providing the mortgage financing, and the amount of financing the lender was providing.

Westerfield also had little contact with her clients. She only met her clients at the closings, and for the fifth closing, she drafted powers of attorney that allowed

Johnson to sell the home without the presence of a fake seller. In all the closings, Westerfield guided the fake buyers and sellers through the closing procedures and told them where to sign their designated names on a variety of documents. Westerfield then arranged to have the mortgage proceeds sent to an unknown third party through letters of direction. Westerfield directed the mortgage proceeds from the first transaction to R.M.D., LLC, a corporate entity owned by Johnson, and directed the proceeds from the remaining four transactions to Richard Preston, who turned out to be the dead brother of one of Westerfield's co-defendants. The government never presented evidence showing that Westerfield received a cut of these mortgage proceeds, but she did receive $12,250 for her customary attorney's fees and title-company fees.

The indictment charged Westerfield with four counts of wire fraud in violation of 18 U.S.C. § 1343 for four of the five real estate transactions that she had facilitated. She was not charged for the initial transaction that she facilitated, and she was not involved in the transactions in the other sixteen counts. The other eleven defendants accepted plea bargains, but Westerfield pleaded not guilty on all four counts and her case went to trial in March 2011. The government presented evidence of Westerfield's activities as documented through various financial records and based on the testimony of many people, including Westerfield's co-defendants, a title company representative, identity theft victims, and three closers who were supposed to be representing the mortgage lenders. Westerfield did not call any witnesses, and she did not testify herself.

The jury convicted Westerfield on three of the four counts on March 21, 2011. Westerfield moved for a judgment of acquittal and argued that the government had not provided sufficient evidence to support her conviction, but the district court denied her motion. On February 28, 2012, the district court sentenced Westerfield to 72 months in prison with three years of supervised release, and ordered her to pay $916,300 in restitution. Westerfield appealed.

## II.  Discussion

Westerfield first challenges her conviction based on the sufficiency of evidence and on the admission of Johnson's testimony during trial. If we uphold the conviction, she argues that we should remand for resentencing under the U.S. Sentencing Guidelines and for a recalculation of the restitution value. We consider each of these arguments in turn.

### A.  Sufficiency of Evidence

Westerfield first argues that the district court erred when it denied her motion for a judgment of acquittal. We review a district court's decision to deny a motion for judgment of acquittal de novo. *United States v. Macari*, 453 F.3d 926, 936 (7th Cir. 2006). When considering such a motion, we examine "whether a jury verdict has evidentiary support in a criminal case by asking if there was sufficient evidence, when viewed in the light most favorable to the government, to allow a rational trier of

fact to find all of the essential elements of an offense beyond a reasonable doubt." *United States v. Owens*, 301 F.3d 521, 527 (7th Cir. 2002). To establish wire fraud under § 1343, the government must show "(1) that the defendant participated in a scheme to defraud; (2) with the intent to defraud; (3) and used . . . interstate wire . . . in furtherance of the fraud.*" United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010).

Westerfield argues that she merely performed the typical actions of a real estate lawyer, and the government therefore failed to show that she had the necessary intent to defraud. The government did not present any direct evidence that Westerfield knew that the scheme was illegal, but instead argued that circumstantial evidence demonstrated Westerfield's intent. The government therefore requested, and the district court granted, an "ostrich" jury instruction that told jurors they could "infer knowledge from a combination of suspicion and indifference to the truth." If the jury found "that the defendant had a strong suspicion that things were not what they seemed or that someone had withheld some important facts yet shut her eyes for fear of what she would learn," the jury could conclude that Westerfield acted with the necessary intent. Such an instruction allows a jury to convict a defendant solely on circumstantial evidence. *See United States v. Carrillo*, 435 F.3d 767, 779-80 (7th Cir. 2006) ("It is appropriate to give the ostrich instruction where the defendant claims a lack of guilty knowledge, and the government presents circumstances from which a jury could conclude that the defendant deliberately avoided the truth.").

At trial, the government presented evidence that Westerfield had prepared real estate transactions indicative of fraud. She had helped two buyers purchase five homes with financing from different lenders during a short period of time. August Butera, the senior president and general counsel of Attorneys' Title Guaranty Fund, Inc., testified that this behavior would have made him concerned. Borrowing from multiple lenders is a "red flag issue," Butera explained, because it allows fraudulent transactions to avoid immediate detection. He further commented that he would have been especially concerned because the purchases were financed almost completely on mortgage loans. Three of the homes had been purchased with 100% financing, one with 95% financing, and one with 90% financing. These are all high loan-to-value ratios that are normally offered only for the purchase of a single, primary residence.

The government also presented evidence that Westerfield would have realized that she was not engaged in normal real estate transactions based on the unusual nature of her clients. Johnson testified that he had recruited the fake buyers and sellers for the fraudulent transactions, and he stated that he recruited people he didn't even know because "[a]nybody could fit the profile." He testified that some of these people he picked up "down by an abandoned building . . . by shelters," and acknowledged that he "literally pick[ed] people off the street." At least one of them had a marijuana and cocaine habit. Westerfield had no previous relationship with the fake buyers and sellers but instead met them

only at the real estate closings. These fake buyers and sellers relied on Westerfield to guide them through the closing process, and the government presented evidence suggesting that Westerfield rushed her clients through the process without explaining the implications of the paperwork they were signing. For Westerfield's final transaction, she never even met the fake sellers, but instead drafted powers of attorney that allowed Johnson to sell the property without them.

Finally, the jury heard evidence that Westerfield arranged to have the proceeds from the real estate transactions directed to a third party not involved in the real estate transactions. The closers working for Attorneys' Title Guaranty Fund, Inc., testified that a seller rarely—if ever—directs 100% of the proceeds to a third party. But Westerfield nonetheless drafted letters of direction that directed the money to R.M.D., LLC, and Richard Preston. Westerfield had received instructions to draft these letters of direction from Burnett, who in turn, had received the instructions from Johnson.

Westerfield would have realized that these real estate transactions were fraudulent even though the closers, who represented the mortgage lenders at the closings, did not. The closers were supposed to ensure that all the documents were properly signed according to the lenders' instructions, which were usually five or six pages long. But even though these closers were involved in the real estate transactions, they did not actively work with the buyers and sellers to fill out the forms. They instead gave the parties instructions on how

to complete the appropriate forms and then continued their own work in a separate room. Additionally, the closers often managed multiple transactions at the same time, and did not sit down and work on just one transaction.[1] Finally, Attorneys' Title Guaranty Fund, Inc., only had an informal system to detect when a buyer purchased multiple homes but fraudulently stated that each home was a primary residence. If the closers observed that a buyer was purchasing multiple homes within a short period of time, the closers were expected to pass that information on to the president of Attorneys' Title Guaranty Fund, Inc. But in Westerfield's case, different closers were assigned for each of the fraudulent transactions, thus enabling the repeat buyers to avoid detection.[2] Westerfield, on the other hand, was present for each transaction.

Overall, the jury learned that Westerfield had helped two individuals purchase five homes in a short period of time with financing from different lenders at

---

[1] The closers were supposed to represent the lenders at the closings, but they were barely involved in the closing process. This lack of sensitivity in just five transactions caused the lenders to lose almost a million dollars. With so much money at stake, it seems obvious that the closers should have been more involved in the real estate transactions.

[2] The closers' failure to scrutinize the real estate transactions in which they were supposed to represent the lenders has understandably led to changes at Attorneys' Title Guaranty Fund, Inc. The company has revised its anti-fraud policies, and now has a formal system that tracks buyers' purchases.

high loan-to-value ratios. She rushed the buyers and sellers—who were clueless and obviously fake—through the closing process and then gave the mortgage proceeds to a third party. Based on this evidence, a reasonable jury could conclude that if Westerfield had been unaware that she was facilitating an illegal scheme, she only lacked such knowledge because she was deliberately ignorant. *See Carrillo*, 435 F.3d at 779-80. The district court therefore did not err in denying Westerfield's motion for judgment of acquittal.

## B. Johnson's Testimony

Westerfield next argues that the district court wrongly admitted Johnson's testimony. Johnson testified about the scheme that he had helped organize. He explained the general workings of the scheme, then focused on Westerfield's role in it. When a party objects to the admission of evidence, we review a district court's decision to admit the evidence for abuse of discretion. *United States v. Thomas*, 294 F.3d 899, 904 (7th Cir. 2002).

Westerfield objected only once during Johnson's testimony:

[Gov't.]

Generally speaking, did you pay the participants you recruited to each of these transactions?

[Johnson]

Yes, sir.

Do you know whether LeAndre Burnett and Lorie Westerfield had any financial arrangements?

No, sir.

Did you suspect that they did?

Yes, sir.

[Defendant]

Objection to suspicion, Judge.

The Court:

Okay. I'll allow it. The objection is overruled. I'll let the answer stand.

Westerfield's attorney did not specify a rule of evidence in this objection, but context and Westerfield's briefs indicate that this is an objection to the foundation of the testimony under Federal Rule of Evidence 602. Rule 602 states: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602.

Johnson had testified extensively about the real estate scheme that he had helped organize. He had specifically talked about Burnett's role in the scheme, and had said that Burnett "was making a lot of money" and needed "to have somebody to trust" in the scheme. Therefore, when Johnson testified that he suspected that Burnett had a financial arrangement with Westerfield, Johnson's testimony had already established his personal knowledge of Burnett's role in the scheme.

The government argues that Johnson's testimony was admissible as opinion testimony from a lay witness.

But Johnson was an occurrence witness who testified about his personal thoughts. Nonetheless, if we were to characterize his statement as opinion testimony, we would examine it under Federal Rule of Evidence 701. This rule allows opinion testimony by lay witnesses when the testimony is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Johnson's testimony was based on his perception because he had helped organize the scheme and had personally seen Westerfield facilitate fraudulent real estate transactions. *See United States v. Wantuch*, 525 F.3d 505, 513 (7th Cir. 2008) (holding that lay opinion testimony was rationally based on the witness's perception because the witness had observed and participated in the defendant's illegal activities). Additionally, Johnson's testimony was useful to the jury because it explained how the mortgage fraud scheme operated. Finally, Johnson's testimony was not expert testimony within the scope of Rule 702. Therefore, because Johnson had sufficient personal knowledge under Rule 602, and his statement was permissible under Rule 701 to the extent that it was opinion testimony, the district court's decision to overrule Westerfield's objection was not an abuse of discretion.

Westerfield further urges us to review the remainder of Johnson's testimony even though she did not object to

it in the district court. Westerfield contends on appeal that Johnson lacked personal knowledge in other portions of his testimony. Specifically, she argues that Johnson lacked personal knowledge to testify about Burnett's relationship with Westerfield. She also argues that Johnson lacked personal knowledge to testify that Westerfield had prepared the real estate documents for the fake buyers and sellers at the closings.

Because Westerfield did not object to these statements at trial, we review only for plain error. *United States v. Prude*, 489 F.3d 873, 880 (7th Cir. 2007). The record establishes that Johnson had personal knowledge of the scheme through his own involvement in it. He worked closely with Burnett to organize the scheme, and he worked with Westerfield to fill out the paperwork at the closings. This personal involvement in the scheme satisfies any Rule 602 concerns. Similarly, his testimony was acceptable under Rule 701 because it was based on his own experience in the scheme and because it further explained how the scheme operated. We therefore see no plain error in the remainder of Johnson's testimony.

## C.  Sentencing Guidelines

Because we uphold Westerfield's conviction, we now address Westerfield's argument that the district court improperly calculated the value of loss from her convictions under § 2B1.1(b)(1) of the U.S. Sentencing Guidelines. Westerfield did not object to the value of loss used in the sentencing calculations in the district court, and the government therefore responds that we cannot

address this argument because it has been waived. But Westerfield did not explicitly waive this argument, and there was no strategic reason for her to waive it implicitly. *See United States v. Anderson*, 604 F.3d 997, 1001-02 (7th Cir. 2010). We conclude that Westerfield merely forfeited this issue, and we therefore review for plain error. *United States v. Canady*, 578 F.3d 665, 669 (7th Cir. 2009).

Westerfield argues that the district court incorrectly used the value of loss from all five of the transactions she facilitated ($916,300) instead of only the three transactions for which she was convicted ($714,000) in its calculations under § 2B1.1(b)(1). But § 1B1.3(a)(2) of the Sentencing Guidelines states that when the district court totals the "relevant conduct" of multiple counts under § 3D1.2(d), the court should include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). To establish such "relevant conduct" in the factual findings, "a district court should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense." *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991). We may nonetheless affirm without a recitation of "magic words" that reference § 1B1.3(a)(2) if the record supports the district court's conclusion. *United States v. Patel*, 131 F.3d 1195, 1204 (7th Cir. 1997); *see also United States v. Salem*, 597 F.3d 877, 889 (7th Cir. 2010) (requiring district courts to state key findings needed

for a sentencing, and advising counsel to prompt courts to do so if the key findings are omitted).

At the prompting of the government's attorneys, the district court defined the scope of the scheme in Westerfield's case. The district court stated in the sentencing hearing that the scheme included all five transactions that Westerfield had facilitated. This statement was made as part of the court's analysis of the number of victims needed for § 2B1.1(b)(2), but it is just as applicable to the analysis of the value of loss under § 2B1.1(b)(1).

Even if the district court's discussion of the scope of the scheme was insufficient for purposes of § 1B1.3(a)(2), Westerfield's offense level would remain the same under her proposed calculations. Section 2B1.1(b)(1) of the Sentencing Guidelines provides that loss values between $400,000 and $1,000,000 lead to an increase of 14 offense levels, and both $916,300 and $714,000 fall within this range. Westerfield acknowledges that her offense level would remain the same under its proposed calculations, but suggests that "a lower total loss amount may have influenced the District Court's sentencing determination." This hypothetical conjecture is baseless, and certainly does not establish plain error. *See United States v. Crockett*, 82 F.3d 722, 730 (7th Cir. 1996) (ruling that deficiencies in the district court's statements were "harmless" because the defendant's "base offense level would not . . . be affected").

**D. Restitution**

Finally, Westerfield challenges the value of restitution that the district court imposed. The probation officer's Pre-Sentence Investigative Report stated that Westerfield should pay $714,000 in restitution, but the government informed the district court during the sentencing hearing that the amount should actually be $916,300. The district court agreed to modify the amount of restitution to $916,300, and Westerfield did not object. Because Westerfield did not object in the district court, the government argues that Westerfield waived this issue, but again, it was merely forfeiture. *See Anderson*, 604 F.3d at 1001-02. We therefore review for plain error. *United States v. Dokich*, 614 F.3d 314, 318 (7th Cir. 2010).

Federal courts may order restitution in a criminal case only if they are authorized to do so by statute. *United States v. Pawlinski*, 374 F.3d 536, 540 (7th Cir. 2004). The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, authorizes district courts to impose restitution in wire fraud cases. If a conviction involves a scheme, the MVRA requires restitution for "any person directly harmed by the defendant's criminal conduct in the course of the scheme . . . ." § 3663A(a)(2). To establish a scheme, the district court should make specific findings on whether the convictions were multiple iterations of the same crime or whether the convictions should be treated as a single scheme. *United States v. Locke*, 643 F.3d 235, 247 (7th Cir. 2011). Failing to do so may be plain error. *Id.* at 246. Although the

"relevant conduct" analysis for the Sentencing Guide-lines is analytically different from this analysis under the MVRA, we have recognized that the evidence is similar and can overlap. *Id.* at 247 n.7.

Because the district court increased the restitution value during Westerfield's sentencing hearing, the court did not have a prepared explanation for its deci-sion to do so. Nonetheless, the court stated that "we've addressed this with other co-defendants also and I want to be consistent." The court then indicated that it was increasing the restitution value to include all five fraudulent transactions because the restitution would then be owed jointly and severally with five other co-defendants. Because the district court had already indicated that the five transactions would be treated as a single scheme in its earlier "relevant con-duct" discussion, the district court did not commit plain error by increasing the restitution value to $916,300.

### III. Conclusion

The jury heard sufficient evidence to convict Westerfield of wire fraud and Johnson's testimony was properly admitted as evidence. Additionally, the district court did not commit plain error in Westerfield's sentencing. We therefore AFFIRM Westerfield's conviction and sen-tence.