In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-1586

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FERAS RAHMAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 11-CR-103 — **Rudolph T. Randa**, *Judge.*

ARGUED JANUARY 22, 2014 — DECIDED NOVEMBER 9, 2015

Before WOOD, *Chief Judge*, and MANION and WILLIAMS,
*Circuit Judges.*

WILLIAMS, *Circuit Judge*. In the early morning hours of
January 19, 2010, the building that housed the Black & White
Café, Grecian Delight, Cush Lounge, the Pizza Man restaurant and ten apartments burned to the ground. In hopes of
discovering how the fire started, fire investigators asked Feras Rahman to sign a consent form that allowed investigators to look for the "origin and cause" of the fire. While in-

vestigating the fire, investigators walked together across the basement performing a line search looking for a laptop and safe that Rahman told investigators were there, but after much searching, investigators found neither. Based on the absence of the laptop, the presence of gasoline, and other evidence, investigators settled on arson as the cause of the fire and Rahman as the suspect. Rahman was charged with, among other things, arson and lying to investigators about the location of the laptop. He was eventually acquitted of the arson counts, but convicted of one count of providing false statements to the government.

On appeal, Rahman argues that evidence from the basement line search should have been suppressed as it exceeded the scope of his consent. We agree. The investigators had already ruled out the basement as the origin of the fire when they conducted the line search. Their only purpose for conducting the search was to look for secondary and circumstantial evidence of arson, which exceeded the scope of Rahman's consent as it permitted them to look only for the origin and cause of the fire. Rahman also argues that there was insufficient evidence for the jury to find him guilty of giving a false statement to investigators. We agree with him that the fact that one of his computers was found at his home and did not contain business records was not sufficient to find him guilty of the charged false statement, and we remand for further proceedings consistent with this opinion.

## I. BACKGROUND

At approximately 3:30 a.m. on a frigid January 19, 2010, a fire broke out in a Milwaukee building that housed four businesses on the first floor—the Black & White Café ("Café"), Grecian Delight (a restaurant), Cush Lounge, and Pizza

Man—and ten apartments on the second floor. Emergency personnel responded about ten minutes later, but the five-alarm blaze consumed the building, causing the second floor of the building to collapse onto the first floor. At the request of a Milwaukee detective, Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and certified fire inspector Rick Hankins arrived on the scene between 8 and 9 a.m. to document the scene and investigate the cause of the fire.

While the firefighters battled the fire, the building's business owners gathered at a nearby McDonald's, where they were interviewed and asked to consent to a search of their premises. At 8 a.m., Detective Elizabeth Wallich from the Milwaukee Police Department interviewed Feras Rahman, the owner of the Black & White Café, and presented him with a written consent form. The consent form that Rahman signed gave the investigators consent to search the Café "to determine the origin and cause of the fire that occurred on 1/19/10."

Around 10 a.m. Wisconsin Deputy Fire Marshal Antonio Martinez interviewed Rahman. During the course of the interview, Rahman stated that he kept his safe and business records in the basement of the Café. He also mentioned that he owned a laptop that contained some of his business records, but he was not sure if the laptop was in the basement or on the first floor by the cash register. Although Rahman was not certain where the laptop was in the restaurant, he believed that it was still there.

On January 20, Hankins arrived early on the scene to begin investigating the cause of the fire, but the debris from the fire still made most of the building inaccessible. To de-

termine how the fire started, Hankins sought surveillance videos from the businesses damaged in the fire as well as surveillance video from Chubby's Cheese Steaks, a business located across the street from the Café. Sometime after 5 p.m., Hankins saw Chubby's Cheese Steaks's surveillance video, which showed a brief illumination within the Café about 10 minutes before emergency personnel arrived. This video indicated to investigators that the fire originated in or above the Café; in other words, not in the basement. After seeing the video, around 8 p.m., Hankins decided to go down to the basement to retrieve the control mother board panel for the alarm system ("alarm box") of the Café, "because [he] was interested in knowing what kind of data the alarm box might be able to offer … and he wanted to preserve the alarm box for any additional water damage." Hankins stated that alarm systems can give investigators the date and time the system detects the outbreak of a fire and that investigators wanted the alarm box to see what kind of information it contained that might shed light on the fire's cause and origin. According to Hankins, the alarm box was not suspected of causing the fire because neither it, nor the area around it, was damaged by the fire.

On January 21, fire investigators began excavating the Café, layer by layer, as carefully as possible with an excavator. At this point, investigators, including Hankins, had numerous theories as to what started the fire and believed that the fire started somewhere between the first and second floors of the Café. Hankins, for the first time, also fully examined the basement and observed that although the basement contained a significant amount of water, it was obvious to him that the fire did not start there. During his inves-

tigation of the basement, Hankins seized closed bank bags, a tray from a cash register, and a surveillance DVR.

On January 22, Hankins decided to again investigate the basement and to look at entry points people could use to access the building. As part of his investigation, Hankins examined a door between the Café and the Grecian Delight restaurant next door. On the Grecian Delight side, there was a dead bolt lock with a turn knob, which allowed anyone to enter the Café from the Grecian Delight. When Hankins tried the door, the deadbolt was locked, so he broke through and found some large items in front of it. Hankins also had the basement drained so that a group of investigators could walk across the basement performing a line search to look for clues. Based on interviews with Rahman, Hankins was looking for valuable items, including the laptop with the business records on it and a safe, which Rahman told investigators should be in the restaurant. According to Hankins, investigators often look for the remains of valuable items in the ashes of fires as their presence, or more importantly lack thereof, can be clues of criminality as thieves occasionally will commit arson to hide their burglary. After combing through the rubble, investigators found neither the safe nor the laptop.

On January 23, fire investigators were nearly finished excavating the Café, but still had not determined the exact cause and origin of the fire. They had a number of theories and needed a way to eliminate some of them. To help narrow the number of viable theories, investigators brought in Moon, an ignitable liquid detection canine, to confirm or eliminate the possibility that the fire was deliberately set. Moon alerted the investigators to the possible presence of an

ignitable liquid present in several places on the first floor. To confirm the presence of ignitable liquid, investigators took samples and sent them to a laboratory to be tested. It was while Hankins was collecting samples that he smelled gasoline. According to him, since there was no reason for gasoline to be present in the Café, he and his investigators for the first time leaned towards arson as the reason for the fire. After these samples were collected, investigators seized the back door of the Café as well as the door to Rahman's office in the basement. On January 29, Hankins learned that the samples he sent to the laboratory were positive for gasoline.

Based on the positive test of gasoline, investigators focused their investigation on Rahman. In a surveillance video recorded the night of the fire, Rahman was seen leaving the Café with a large, white rectangular box. After a search warrant was executed at Rahman's home, agents found a white rectangular box containing a red laptop computer underneath Rahman's bed. The laptop did not contain business records, but investigators did find a Google Earth search of the two block area surrounding Rahman's restaurant. The government believed that Rahman was using the aerial shots of the neighborhood to search for an escape route.

Rahman's lawyer wrote the government suggesting that it should investigate Andres Karabelas, the owner of the Grecian Delight restaurant, as the culprit that set the fire. According to Rahman, Karabelas started having problems with his business and his personal life in 2008. Allegedly Karabelas had huge debts, mounting losses, and a $250,000 insurance policy. Rahman also argued that Karabelas's restaurant was struggling, that Karabelas could not make his payroll, and that he was late paying his suppliers.

As part of the investigatory process, investigators interviewed Karabelas regarding his actions on the night of the fire. Karabelas said that after closing up the restaurant, he went downstairs and locked the door that linked it to Cush, then, at 3:15 a.m., left through the front door with his two employees. He described the door between the Grecian Delight and the Café as having a deadbolt lock and said it was secured by a padlock to which he did not have the key.

Upon the conclusion of its investigation, the government charged Rahman with arson of a building resulting in injury (Count One), mail fraud (Count Two), arson to commit mail fraud (Count Three), and making false statements (Counts Four and Five) in violation of 18 U.S.C. §§ 844(i), 844(h)(1), 1001, 1341, and 2. Rahman filed a pretrial motion to suppress evidence obtained during searches of the fire scene, alleging that investigators exceeded the scope of his consent. The magistrate judge recommended denying the motion and the district court adopted the recommendation.

At trial the government argued that while Rahman's restaurant was profitable, business had declined since the summer and that Rahman wanted to pursue other business opportunities, but that he could not because he was committed to running the Café. Under the government's theory the only way out of running the Café was to light the fire and then collect $102,000 in insurance proceeds which he could then use to fund other business opportunities. The government also argued Rahman had the opportunity to commit arson in that he had a key to the restaurant and knew the alarm code. The defense's theory was that Karabelas was responsible and could have entered the Café through the basement door, gone up the steps, spread the gasoline and

thrown the match, then ran out, returned to the Grecian Delight, closed the basement door and covered it with some materials, and left.

After a two-week trial, Rahman was convicted of one count of making a false statement concerning the laptop with business records on it (Count Four). According to the government, Rahman lied when he told them that his laptop was at the Café because he knew it was located at his home. Although Rahman was convicted of making a false statement, he was acquitted on the other counts. Rahman then filed a motion for judgment of acquittal or, in the alternative, for a new trial, but the motion was denied by the district court.

At sentencing, the government asked the court to consider Rahman's acquitted conduct of arson, and the district court stated that it was willing to do so if the government established the conduct by a preponderance of the evidence. After conducting two sentencing hearings, listening to arguments, and considering the government's proposed findings of fact, the court concluded that Rahman was responsible for the arson and sentenced him to 30 months' imprisonment, but allowed him to remain free pending the result of this appeal. Rahman now appeals the district court's order denying his motion to suppress the evidence obtained during a search of the fire scene, the denial of his motion for judgment of acquittal, and his sentence.

## II. ANALYSIS

### A. Motion to Suppress Should Have Been Granted

When reviewing a denial of a motion to suppress, we review the district court's factual findings for clear error and

its legal conclusions de novo. *United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004).

### 1. Investigators Committed a Trespass

Rahman argues that the district court should have granted his motion to suppress evidence collected during numerous searches of the Café's basement as they violated the Fourth Amendment. Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). The text of the Fourth Amendment is closely connected to property, and for most of our country's history, Fourth Amendment jurisprudence was tied to common-law trespass. *See United States v. Jones*, 132 S. Ct. 945, 949 (2012). However, during the latter half of the twentieth century, this court, following the Supreme Court's example, expanded Fourth Amendment protections and deviated from an approach that was exclusively property-based. *Id*. at 949-50. In *Katz v. United States*, 389 U.S. 347 (1967), the Court was asked to decide whether a Fourth Amendment violation occurred when an eavesdropping device was attached to a public telephone booth. In reaching its conclusion that a violation occurred, the Court said that "the Fourth Amendment protects people, not places." *Id*. at 351. After *Katz*, courts around the country focused on whether a person's "reasonable expectation of privacy" was violated to determine when a Fourth Amendment violation occurred. *See Jones*, 132 S. Ct. at 950. Although the *Katz* reasonable expectation test was the predominant test that courts used, the common-law trespass theory was still available to defendants. *Id*. at 952 (stating that the *Katz* test was added as an al-

ternative test to the common-law trespass test and was not designed to replace it). It is under this trespass theory on appeal that Rahman argues the government violated his Fourth Amendment rights, and we agree.

Rahman did not argue that his rights were violated under a common-law trespass theory before the district court, and under normal circumstances we might consider his argument forfeited since the argument was available to him at the time of the search. However, because the government did not argue that Rahman forfeited this particular argument and addressed it in its appellate brief, we may reach the merits of Rahman's argument under the "waived waiver" doctrine. *See United States v. Prado*, 743 F.3d 248, 251 (7th Cir. 2014) (stating that the defendant's forfeiture of his appellate argument was absolved by the government's failure to recognize the forfeiture and its response on the merits to defendant's argument). After careful review, we conclude that the fire investigators' search of the Café's basement violated Rahman's Fourth Amendment rights, and that certain pieces of evidence collected in the basement as a result of the search should have been suppressed.

Under the common-law trespass theory, a violation occurs when government officials, without a warrant: (1) physically intrude (2) on a constitutionally protected area (3) for the purposes of obtaining information, and (4) an exception to the warrant requirement does not apply. *See Jones*, 132 S. Ct. at 949-52. There is no doubt that investigators physically intruded upon Rahman's restaurant and that the restaurant is a constitutionally protected area. *See Michigan v. Tyler*, 436 U.S. 499, 508 (1978) (applying Fourth Amendment protection to commercial property and stating that a warrant was re-

quired to search the defendant's furniture store); *see also See v. City of Seattle*, 387 U.S. 541, 543 (1967) (stating that "[t]he businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property"). And neither party disputes that the investigators were on Rahman's property to gather information. The only remaining question as to whether the investigators' search violated the Fourth Amendment is whether an exception to the warrant requirement applies.

### 2. Investigators Exceeded Scope of Rahman's Consent

The government argues that the search did not violate Rahman's Fourth Amendment rights because Rahman gave written consent to all searches of the Café's basement when he signed a form giving his consent to search the Café "to determine the origin and cause of the fire that occurred on 1/19/10." Because a person may voluntarily waive his Fourth Amendment rights, no warrant is required where the defendant consents to a search. *United States v. Matlock*, 415 U.S. 164, 171 (1974); *United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009). Rahman, however, maintains that his written consent to search for the fire's "origin and cause" was just that—a search to determine the fire's origin and cause—and that it did not include consent to search for secondary and circumstantial evidence that could point to criminality, such as collecting evidence from the bank bags, his business receipts, and the like.

"The scope of a search is generally defined by its expressed object," *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), and the scope of the investigators' search cannot exceed the

scope of a defendant's consent, *see United States v. Long*, 425 F.3d 482, 486 (7th Cir. 1995). In determining the scope of a defendant's consent, we apply an objectively reasonable standard. *Jimeno*, 500 U.S. at 251. Whether a search remained within the boundaries of consent is a factual question that is determined by the totality of the circumstances. *Long*, 425 F.3d at 486; *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000).

Rahman's consent to search the Café for the "origin and cause" of the fire did not encompass a search for secondary and circumstantial evidence of arson. Rahman argues that the term "origin and cause" is a legal term of art that carries a precise definition that is limited in nature, as opposed to the broader meaning that the government would like us to adopt, and that it was in that limited context that he gave consent. The government, on the other hand, contends that arson can be a cause of fire and that an objectively reasonable person, when asked if fire investigators could search for "origin and cause" of the fire, would assume that the officers would be looking for arson. There is some support for the government's argument. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 997 (7th Cir. 2004) ("The cause of any fire may fall into one of three broad categories: accidental, incendiary [intentionally set fire] and undetermined."). But if we look to guidance from the Supreme Court, the issue becomes a little clearer.

In *Michigan v. Clifford*, the Supreme Court was asked to determine whether evidence should be suppressed after it was collected by fire investigators without a warrant. 464 U.S. 287 (1984). The fire in that case began in the early morning hours and was extinguished a few hours later. *Id*. at 290.

While the fire investigators waited for water to be pumped out of the house, they found a fuel can in the home's driveway, seized it, and marked it as evidence. *Id*. After the water was pumped out of the basement, the investigators first searched the basement and quickly confirmed that the fire originated in the basement beneath the basement stairway. *Id*. The investigators continued their search and found two fuel cans beneath the basement stairway and a crock pot with attached wires leading to an electrical timer that was plugged into an outlet a few feet away. *Id*. at 290-91. After determining that the fire had originated in the basement, the investigators did not obtain a criminal warrant, but instead proceeded to search the remainder of the house looking for clues that pointed to arson. *Id*. at 291.

The Court was confronted with deciding when, and under what circumstances, investigators needed to obtain a criminal warrant if they wanted to search for evidence of criminal activity. The Supreme Court's task was made difficult by the fact that fire investigators are not on the scene to suppress the fire, but to determine how the fire was started, which in some cases means gather evidence that points to arson. The Court tried to address the matter of distinguishing between when fire investigators are on the scene to determine literally what spark caused the fire and where the fire first started, and whether criminal actions breathed life into a fire. In addressing the issue, the Court said, "[i]n many cases, there will be no bright line separating the firefighters' investigation into the cause of a fire from a search for evidence of arson. The distinction will vary with the circumstances of the particular fire and generally will involve more than the lapse of time or the number of entries and re-entries." *Id*. at 298 n.9. Although the Court recognized the

ambiguity in determining the origin and cause of a fire, the Court made one thing clear: if the primary object of investigators is to determine the cause and origin of a recent fire, investigators simply need an administrative warrant to conduct a valid search. *Id*. at 294. But if investigators' primary object for conducting a search is to gather evidence of criminal activity, then they need a criminal search warrant. *Id*.

Using the principle as its guide, the Court affirmed the exclusion of the two fuel cans found in the basement, the crock pot, the timer, and the cord that were found after fire investigators determined where the fire started. *Id*. at 299. Moreover, the Court found that once fire investigators had determined the cause of fire, the additional search of the upstairs portion of the home could only have been for the purpose of finding evidence of arson, and therefore excluded all evidence that was found after the investigators made their determination. *Id*. at 297, 299.

As we understand *Clifford*, it is clear that the term "origin and cause" excludes any search whose *primary object* is to find information of criminal activity. *Id*. at 294, 298. As part of this exclusion is any search conducted in an area that is known not to be the origin of the fire, unless the evidence seized in this area helps investigators determine how the fire started. As the Court made clear, in many situations the primary object of a search conducted after the origin of the fire is determined is to gather evidence of criminal activity. *Id*. at 297. If no exception to the warrant requirement applies, the search must be conducted pursuant to a criminal warrant. *Id*. at 294.

To be clear, "origin and cause" does not exclude evidence that points to criminality that is seized while investigators

are conducting valid searches to determine where the fire was started and what literally sparked the fire. We know this to be true because the Court said as much. *Id*. at 294 (stating that evidence of criminal activity discovered during the course of a valid administrative search directed at determining the cause of a fire may be seized under the "plain view" doctrine). Applying the plain view doctrine, the Court did not exclude the first fuel can investigators seized before they determined where the fire started. *Id*. at 299.

The analysis of *Clifford* helps us determine the parameters of the written consent Rahman gave to fire investigators "to determine the origin and cause of the fire that occurred on 1/19/10." Relying on *Clifford*, we find that based on the totality of the circumstances, an objective reasonable person would conclude that when investigators asked Rahman for consent to determine the origin and cause of the fire, they would understand the request to be for consent to determine where the fire occurred and what sparked the fire, not for a search whose primary object is to look for criminal activity.

Although the government argues that a lay person could possibly think that the term "origin and cause" included arson, we do not think it wise to allow the government to benefit from a layperson's misconception of a phrase with legal significance, especially when investigators can clear up any misconception by informing the consenter in writing that investigators are looking for evidence of criminal activity and that such evidence could be used against him. Allowing investigators to benefit from a layperson's misconception would create perverse incentives for the government in drafting consent forms. Our conclusion fits within the broader meaning of the Fourth Amendment, which allows

people to be "secure in their persons, houses, papers, and effects," and prevents that right from being undermined by the public's potential misconception of legal terms. Based on our interpretation of *Clifford*, we may now decide what, if any evidence, should have been suppressed.

Rahman argues that the alarm box that Hankins seized on January 20 should have been suppressed because it would have only yielded secondary evidence connected to arson. We do not agree. There is no indication in the record that Hankins sought the alarm box in order to determine whether criminal activity occurred. Based on the surveillance tape from Chubby's Cheese Steaks, the investigators suspected that the fire started at 3:31 a.m. and that the origin of the fire was in or above the Café. It appears as though Hankins wanted the alarm box because it might contain information that would tell investigators what time the fire started, which might help pin down the fire's cause and origin. Rahman argues that Hankins ruled out the alarm box as the source of the fire because neither the alarm box, nor the area immediately surrounding it, was damaged by the fire. While that is true, Hankins had not ruled out the basement as the origin of the fire until the 21st, the day after he seized the alarm box. Given the potential useful nature of the information obtained from the alarm box that would help firefighters determine the cause and origin of the fire, the fact that Hankins had not yet ruled the basement out as the origin of the fire, and that there is no indication that Hankins's primary object for seizing the box was to obtain information related to criminal activity, we conclude that the alarm box was properly admitted.

The same cannot be said about most of the remaining evidence seized from the basement. According to Hankins's own testimony, he ruled out the basement as the origin of the fire on January 21. Following the logic of *Clifford*, the presumption is that once the basement was ruled out as the origin of the fire, the search that Hankins conducted in the basement after he reached his conclusion was done for the purpose of searching for criminal activity, even if the theory had not yet been confirmed. *Clifford*, 464 U.S. at 297 (stating that "[b]ecause the cause of the fire was [] known, the search of the upper portions of the [defendant's] house … could only have been a search to gather evidence of the crime of arson"). Therefore, unless it can be demonstrated that items seized after Hankins reached his conclusion regarding the basement were seized for the purpose of establishing how the fire started elsewhere in the building, any evidence collected from the basement after Hankins reached his conclusion about the origin of the fire, including the closed bank bags, receipts, and a tray from a cash register were illegally seized and should have been excluded. The surveillance DVR seized in the basement on January 21 is admissible because investigators indicated that they were searching for videos of the business to help determine how the fire started, and the surveillance DVR could have helped investigators reach that goal.

Moreover, any evidence collected from the basement on January 22, including the fire investigators' observations regarding the absence of a computer and safe in the basement, should be excluded. Rahman told investigators that a safe, laptop, bank bags and receipts were located in the basement office of the Café, but after conducting a search they found no traces of a laptop or safe. On direct examination, Hankins

testified that one of the reasons he looked for the presence of those items was to determine whether someone might have intentionally set the fire to cover up a burglary. Based on Hankins testimony, it is clear that the primary reason he searched the basement on January 22 was to find evidence of criminal activity.

However, observations made on January 22 about the basement door between the Café and the Grecian Delight are admissible. Hankins stated that the goal for breaking the lock on the door was to secure a surveillance video or system that the owner of the Cush Lounge indicated would be located in the basement of the Cush Lounge. According to Hankins, the reason why the investigators went through the basement of the Café to gain access to the Grecian Delight was because that was the only safe way to get the Cush Lounge's surveillance video. Since the investigators had not yet determined the cause and origin of the fire, the surveillance video would have been helpful in assisting investigators in their search. Although Hankins also admitted that investigators were trying to determine whether someone had broken into the Café from the Grecian Delight to set the fire, it is clear from the record that the primary object for breaking down the door was not to collect criminal evidence. That was simply a by-product of knocking down the door to secure the Cush Lounge's surveillance system, but rather to gain one more piece of information that could help infirm where and how the fire started.

On January 23, investigators seized the door to Rahman's office located in the basement as well as the back door of the Café. According to Hankins's testimony, while he was collecting samples to send to the laboratory to determine if ig-

nitable liquid was present, he smelled gasoline. It was at this moment that he and other investigators leaned towards arson as the cause of the fire. Hankins testified that he collected these doors after they reached that conclusion. Based on the record, we conclude that both doors should be excluded because at the moment investigators seized the doors, they were collecting evidence based on a theory that the fire in the Café was intentionally set. Moreover, observations made on the 26th about the basement door between the Café and the Grecian Delight should also be suppressed. As we previously stated, Hankins ruled out the basement on the 21st and there is no evidence in the record that indicates that the door was taken for the purpose of discovering the origin and cause of the fire. Therefore, it must have been seized for the purpose of determining whether arson occurred.

### 3. *Davis* **Good-Faith Exception Does Not Apply**

The government argues that investigators did not exceed the scope of Rahman's authority, but that if they did, the *Davis* good faith exception applies to all searches of the basement. Specifically, the government argues that Hankins reasonably relied in good faith upon Rahman's broadly written consent and subsequent failure to object to the investigators' search and that under the *Katz* test, Rahman failed to demonstrate that he had a subjective expectation of privacy in his restaurant. Under *Davis v. United States*, "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." 131 S. Ct. 2419, 2423–24 (2011).

We reject this conclusion because at the time of the search, binding precedent with regard to searches was *Katz's* reasonable expectation of privacy test, but also the common-

law trespass theory. The Court in *Jones* stated that even though for most of our country's history "the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates," the Court made clear that "*Katz* did not repudiate that understanding." 132 S. Ct. at 950. In articulating this principle, the Court reiterated a sentiment articulated by Justice Brennan, in *United States v. Knotts*, when he stated that neither *Katz*, nor its progeny, eroded the common-law trespass theory. 460 U.S. 276, 286 (1983) (Brennan, J., concurring in judgment); *see also Jones*, 132 S. Ct. at 955 (stating that the *Katz* test augmented, but did not displace or diminish, the common-law trespass test that preceded it) (Sotomayor, J., concurring). Therefore, at the time of the search, there were two branches of Fourth Amendment jurisprudence that bound the government's actions: the reasonable expectations theory first articulated in *Katz* and the older, historical common-law trespass theory based on the text of the Fourth Amendment. *See Wilson v. Health & Hosp. Corp. of Marion Cnty.*, 620 F.2d 1201, 1213 (7th Cir. 1980) (stating that *Katz* was not intended to render considerations of common law property rights irrelevant, but rather it expanded the Fourth Amendment to privacy and legitimate expectations of privacy). As the common-law trespass theory has always bound government actions, the government cannot rely on the *Davis* good faith exception. Therefore, the evidence that we have previously deemed excluded is not saved by *Davis* since binding appellate precedent at the time of the search would have prohibited the fire investigators' search.

### B. Judgment of Acquittal

Rahman also appeals the denial of the motion he made for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. To convict Rahman of making a false statement in violation of 18 U.S.C. § 1001, the government needed to show that Rahman knowingly and willfully made a materially false statement in connection with a matter within the jurisdiction of a federal agency. *See United States v. Lupton*, 620 F.3d 790, 805 (7th Cir. 2010). We review the denial of Rahman's motion for judgment of acquittal de novo. *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). In doing so, we ask whether "there was sufficient evidence, when viewed in the light most favorable to the government, to allow a rational trier of fact to find all of the essential elements of an offense beyond a reasonable doubt." *United States v. Westerfield*, 714 F.3d 480, 484 (7th Cir. 2013) (quotation omitted).

Although Rahman argues to the contrary, a jury could find that that his statement to Wisconsin Deputy Fire Marshal Martinez was made in connection with a matter within the jurisdiction of a federal agency. The Supreme Court has instructed that "jurisdiction" in the 18 U.S.C. § 1001 context should not be "given a narrow or technical meaning." *Bryson v. United States*, 396 U.S. 64, 70-71 (1969). Rather, here "[t]he term 'jurisdiction' merely incorporates Congress' intent that the statute apply whenever false statements would result in the perversion of the authorized functions of a federal department or agency." *United States v. Stanford*, 589 F.2d 285, 297 (7th Cir. 1978). "A department or agency has jurisdiction … when it has the power to exercise authority in a particular situation." *United States v. Rodgers*, 466 U.S. 475, 479 (1984).

"Jurisdiction" for § 1001 purposes is not dependent upon whether the agency has in fact exercised that authority. *United States v. Brack*, 747 F.2d 1142, 1151 (7th Cir. 1984).

There is no question that Hankins was a member of the ATF and that the ATF is a federal agency. Rahman argues that there was no jurisdiction for § 1001 purposes because when he made the statement at issue to Martinez a few hours after the fire, the ATF was not in charge of the investigation as it was a multi-jurisdictional effort. Rahman contends that Hankins's presence at the scene at the time Rahman made his statement to a local official was not enough to provide federal jurisdiction. We disagree. Here, while many agencies were involved, ATF was one of those agencies, and it had the power to exercise authority because the agency has a federal responsibility to investigate fires that affect interstate commerce, and the building that burned down housed businesses engaged in interstate commerce. *See* 18 U.S.C. §§ 844(h)(1) & (i). Hankins and the other investigators shared information and discussed theories regarding the fire during the course of the investigation. In particular, Agent Martinez shared the information that Rahman provided in the interview with ATF investigator Hankins, and Hankins used that information in his investigation of the scene. *See Brack*, 747 at 1151 (7th Cir. 1984) (finding jurisdiction and stating that the "false statement need not be submitted directly to the federal agency: it suffices to show that the deception of a private company affected a federal agency because of that agency's responsibility to ensure that its funds are properly spent"). We are satisfied that there was sufficient evidence for the jury to find that Rahman made a statement in connection with a matter within the jurisdiction of a federal agency for purposes of 18 U.S.C. § 1001.

Whether the government proved that Rahman made a false statement is a more difficult question. At trial, Martinez testified that during his interview with Rahman, he asked Rahman where he kept his business records. Recounting Rahman's reply, Martinez testified: "And he told me that all his business records were kept in his basement in his office. And he also has—his computer, like a laptop that he keeps down there, and he keeps a lot of business records on that laptop." The prosecutor next asked, "And he said that the computer would be in the restaurant?" Martinez responded, "Yeah, he believes it was in the restaurant, but he wasn't sure if it was in the basement or up by the cashier. Or the cash counter in the front." The prosecutor asked Martinez to confirm that, according to Rahman, the laptop was in one of those two places, and Martinez agreed. When asked whether Rahman described the area in the basement where the laptop would have been if he had left it in the basement, Martinez said it "would have been in his office by–on his desk."

The false statement that Rahman was charged with making was, according to the jury instructions, "that his computer, which he claimed contained the business records of the Black and White Café, was inside the Café at the time of the fire." The government maintains the statement was false because investigators found a red Gateway laptop in Rahman's home that did not contain business records. Rahman, however, maintains that the government failed to prove he made a false statement. For him, the fact that the red laptop did not contain business records supports his position that he was not referring to that laptop when he volunteered to Martinez that one location of his business records was on a computer.

As Rahman emphasizes, Martinez's question to Rahman was directed at business records, not to the presence of a laptop. When Rahman volunteered the information that he also kept business records on a laptop, Martinez did not ask him any questions about the laptop to which Rahman was referring. Rahman was not asked about the laptop's brand, or its color, or anything at all about what it looked like. Martinez did not even ask Rahman how many laptops or computers he had. Investigators who later questioned Rahman after the search of the basement did not ask any clarifying questions regarding the laptop either.

The government's position at trial was that Rahman was referring to the red Gateway laptop when he spoke with Martinez. While the government stresses that a forensic analysis showed there were no business records on the red Gateway laptop, the allegedly false statement that Rahman was convicted of making does not reference this particular computer. The allegedly false statement at issue instead only refers to his "computer," with no other description. And Rahman volunteered to Martinez that he kept records on "a laptop" but never said it was on a red laptop or on a Gateway one. Rahman therefore maintains that the government did not establish beyond a reasonable doubt that the statement at issue could not be true, i.e., that Rahman did not have a second computer. He argues that the government did not establish that another computer, the one with the business records, was not in the Café at the time of the fire.

The government cites our statement, true as a general matter, that the law does not require the government to disprove every conceivable hypothesis of innocence in order to sustain a conviction. *United States v. Humphrey*, 468 F.3d

1051, 1054 (7th Cir. 2006). But the nature of the charge here matters. "When reviewing sufficiency of the evidence through the lens of a perjury conviction," a charge with similarities to the false statement charge here, a literally true answer does not sustain a conviction. *United States v. Gorman*, 613 F.3d 711, 716 (7th Cir. 2010) (citing *Bronston v. United States*, 409 U.S. 352, 356-58) (1973)). That is true even if a defendant gives a misleading or nonresponsive answer. *Bronston*, 409 U.S. at 361-62. Illustrating this principle, the Supreme Court reversed the defendant's perjury conviction in *Bronston* where the statement was both misleading and nonresponsive, but not literally untrue. *Id.*

Although the perjury conviction at issue in *Bronston* was founded on witness testimony in responding to attorney questioning at a court hearing, the Supreme Court's reasoning behind its decision to reverse the conviction there is instructive here as well. The Court said it "perceive[d] no reason why Congress would intend the drastic sanction of a perjury prosecution to cure a testimonial mishap that could readily have been reached with a single additional question by counsel alert—as every examiner ought to be—to the incongruity of petitioner's unresponsive answer." *Id.* at 358. And so, the Supreme Court said, "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360; *see also, e.g., United States v. Parker*, 364 F.3d 934, 945 (8th Cir. 2004) (ruling that the government bears the burden of negating literally truthful interpretations of statements when the statements are ambiguous and are subject to reasonable interpretations).

Here too, the identity of the laptop to which Rahman was referring could have been cleared up by a single additional

question or two by Martinez, or by the other investigators who spoke with Rahman later. A criminal conviction is a drastic sanction when no questioner pinned Rahman down to which laptop he was referring. It was not at all unlikely that Rahman would have more than one computer between work and home, yet the government pinned its case on the laptop in Rahman's statement being the red Gateway.

In fact, that Rahman had more than one computer is just what the jury heard. The jury heard about not just one, but two laptops that Rahman had, and it also heard he used both at the Café. And it was from one of the government's own witnesses that the jury heard about the second computer. Rahman's ex-girlfriend, testifying for the government, stated that she remembered a slow, gray, old, clunky laptop that Rahman kept downstairs at the Café. Downstairs was the location of Rahman's office. Keeping the records on a laptop downstairs would be consistent with Rahman's statement to Martinez that he kept business records downstairs, where his office was. In contrast to the gray laptop, the jury heard that the red laptop was also used by many other people, including by customers, for reasons including to surf the internet and to check social media sites, and that it was also used upstairs. Rahman points out that one might wonder whether a business owner would keep business records on a computer used by many others including customers.

The government argues that "while it is unfortunate that investigators never asked Rahman to describe his laptop, the evidence at trial resolved any ambiguity as to which laptop he was referring." But the failure was more than "unfortunate." And the evidence at trial did not resolve the ambiguous statement. Rahman may not have been referring to the

red laptop when he spoke with Martinez. There was no evidence that another laptop, such as the gray laptop, did not contain business records. So neither the fact that the red Gateway computer was found at Rahman's home nor that it did not contain business records is sufficient to find Rahman guilty of making the charged false statement.

That said, even if there was a second laptop with business records, Rahman could still be guilty of making a false statement if the government proved beyond a reasonable doubt that no other computer was found in the fire. Ordinarily a reviewing court must consider all of the evidence admitted by the trial court when considering a sufficiency of the evidence challenge, regardless of whether that evidence was admitted erroneously. *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988); *see also McDaniel v. Brown*, 558 U.S. 120, 131 (2010); *United States v. Fenzl*, 670 F.3d 778, 783 (7th Cir. 2012) (citing *United States v. Tranowski*, 702 F.2d 668 (7th Cir. 1983)). Here, evidence admitted at trial and heard by the jury included that the search of the basement turned up no evidence of a laptop. But we have ruled that the government may not introduce the basement search evidence, a factor that will undoubtedly be dispositive, or at the least weigh very heavily, when the government decides on remand whether to dismiss the false statement charge.

## C. Remaining Issues

Rahman raises a sentencing issue that we address for completeness in the event there is a retrial. Rahman contends that the sentencing judge relied on factually inaccurate information which influenced the judge's choice of sentence. "When errors of this nature are alleged to have affected the defendant's sentence, we review the lower court record to

determine whether the district court actually relied on the inaccurate information in sentencing the defendant." *United States v. Salinas*, 365 F.3d 582, 586 (7th Cir. 2004). We review the district court's application of the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Bennett*, 708 F.3d 879, 888 (7th Cir. 2013).

After reviewing the record, it is clear the sentencing judgment made a factual error. At sentencing, the judge noted that when firefighters arrived, the back door was unlocked. The judge stated that the only way it could have been unlocked was with a key, and since only Rahman had a key, that meant only Rahman, or someone at his direction, set the fire. The judge further explained that since Andres Karabelas, the owner of the Grecian Delight, did not have a key, he could not have set the fire. That reasoning was clearly wrong, however, as Karabelas did not need a key to open the door from his side of the door. The government also agrees that the district court was mistaken about how the lock operated. While the judge pointed to other reasons why it found Rahman responsible for arson, the judge's finding that Karabelas did not have a key to the basement door that separated the Café from the Grecian Delight seemed to be an important reason why the judge found Karabelas could not have been responsible for the fire. Rahman argues that because of this error, he is entitled to re-sentencing. We agree with Rahman on this point, but because we remand for further proceedings, the judge will only need to consider it if the government elects to retry Rahman and he is again convicted.

## III. CONCLUSION

We REVERSE the district court's denial of the motion to suppress and REMAND for further proceedings consistent with this opinion.