In the

# United States Court of Appeals
### For the Seventh Circuit

No. 17-1076

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JEFFREY J. WILSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cr-00190-SEB-TAB-1 — **Sarah Evans Barker**, *Judge.*

ARGUED SEPTEMBER 14, 2017 — DECIDED JANUARY 12, 2018

Before WOOD, *Chief Judge*, and RIPPLE and HAMILTON,
*Circuit Judges*.

RIPPLE, *Circuit Judge*. A grand jury indicted Jeffrey Wilson,
in a twenty-one-count indictment, with the following
offenses: (1) fraud in connection with the purchase or sale of
securities, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17
C.F.R. § 240.10b-5 (Count 1); (2) fraud in the offer or sale of
securities, in violation of 15 U.S.C. §§ 77q(a) and 77x, and 18
U.S.C. § 2 (Count 2); (3) material false statements in required

Securities and Exchange Commission ("SEC") filings, in violation of 15 U.S.C. § 78ff and 18 U.S.C. § 2 (Counts 3–9); (4) wrongful certification of annual and quarterly reports by a corporate officer, in violation of 18 U.S.C. § 1350(c)(1) (Counts 10–14); (5) material false statements by a corporate officer to an accountant, in violation of 15 U.S.C. §§ 78m(b)(5) and 78ff, 17 C.F.R. §§ 240.13b2-2(a) and 240.13b2-2(b), and 18 U.S.C. § 2 (Counts 16–17 and 19–20); and (6) false statements to Government investigators, in violation of 18 U.S.C. § 1001 (Count 21).

A jury convicted Mr. Wilson on all charges. He then filed a motion under Federal Rule of Criminal Procedure 29(c) for acquittal on all counts, contending that the Government had failed to present evidence sufficient to prove his guilt beyond a reasonable doubt. The district court denied the motion. It then sentenced Mr. Wilson to 120 months' imprisonment for Counts 1, 3–14, 16–17, and 19–20, and to 60 months' imprisonment for Counts 2 and 21, all to run concurrently. The court also imposed 18 months' supervised release per count, each to be served concurrently. The court ordered Mr. Wilson to pay $16,468,769.73 in restitution and a $1,900 assessment.

Mr. Wilson now appeals and renews his challenge to the sufficiency of the evidence. He contends that the Government failed to prove beyond a reasonable doubt that he had the requisite *mens rea* to commit the charged offenses. After hearing oral argument and carefully examining the record, we cannot accept this argument. None of Mr. Wilson's contentions reach the high threshold of showing that a reasonable jury could not have found him guilty. When viewed in the light most favorable to the prosecution, the

evidence adequately supports the jury's finding that Mr. Wilson acted knowingly and willfully when making false statements to investors, regulators, an outside accountant, and Government agents. It also supports the reasonable inference that Mr. Wilson was aware of and participated in a fraudulent tax scheme called "Alchemy." Accordingly, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts[1]

Mr. Wilson was the Director, Chairman of the Board, President, and Chief Executive Officer of a public company called Imperial Petroleum, Inc. ("Imperial") from May 2010, to November 2011. In May 2010, Imperial acquired e-Biofuels, LLC ("e-Bio"), a biofuel company owned previously by Craig Ducey, Chad Ducey, and Brian Carmichael. Craig and Chad are brothers; Carmichael is related to them by marriage. A third brother, Chris Ducey, handled transportation logistics for e-Bio.[2]

Prior to its acquisition by Imperial, e-Bio had developed a fraud scheme called Alchemy. It involved purchasing biodiesel from a third party and then reselling it to customers as though it had been produced originally by e-Bio. This scheme was profitable because it allowed the company to take

---

[1] The facts are based on the trial record viewed in the light most favorable to the Government. *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017).

[2] To avoid confusion, we refer to the Ducey brothers by their first names.

advantage of government incentives for renewable-energy production without actually expending production costs. The relevant incentives are renewable identification numbers ("RINs") and the blender's tax credit.

RINs are essentially labels used by the Environmental Protection Agency ("EPA") to track renewable fuel production and consumption. Biodiesel producers can generate and attach a certain number of RINs to each gallon of biodiesel that they manufacture, using EPA-approved procedures, at EPA-registered facilities.[3] Producers can sell this RIN-valued fuel to petroleum fuel refiners and importers. These customers must obtain and retire a certain number of RINs in order to meet annual regulatory obligations.[4] This system creates a market for RIN-valued biodiesel—*i.e.*, biodiesel that has not yet had its RINs retired.

The blender's tax credit is a $1/gallon credit; it is granted to the taxpayer that first blends biodiesel with any amount of petroleum diesel. Before biodiesel is blended, it is known as B100, which indicates that it is 100 percent biodiesel. Biodiesel is often blended with a small amount of petroleum diesel. This process results in a product known as B99, which is

---

[3] *See* 40 C.F.R. § 80.1126.

[4] *See* 40 C.F.R. § 80.1127. At the end of each compliance year, refiners and importers submit evidence of the RINs they obtained that year. They can apply those RINs to meet their annual obligations, to make up for the prior year's deficit, or to credit their account for the next compliance year. *See* Envtl. Prot. Agency, *Renewable Fuel Standard Program: Overview for Renewable Fuel Standard*, https://www.epa.gov/renewable-fuel-standard-program/overview-renewable-fuel-standard (last visited Dec. 21, 2017).

approximately 99 percent biodiesel and, more importantly, already has been used to claim the tax credit.

Because of these two separate government incentives, RIN-valued B100 is more valuable to biodiesel purchasers than RIN-less B99. The conspirators behind Alchemy profited by purchasing RIN-less B99 and then reselling it as RIN-valued B100. To avoid suspicion, e-Bio used a third-party company, Caravan Trading ("Caravan"), as a middleman. Caravan was owned by Joseph Furando. Caravan would purchase RIN-less B99 at low cost and then resell it to e-Bio along with fake invoices describing the biodiesel as feedstock (*e.g.*, soybean oil or chicken fat). Feedstock is used to create biodiesel, so e-Bio would pretend that it had used this "feedstock" to produce B100 in its own plant. E-Bio generated RINs for this fake B100, which was actually B99 with no legitimate RIN value. The company profited by selling this product at the price of RIN-valued B100.

To carry out this plan, e-Bio hired truck drivers to pick up the RIN-less B99 from Caravan's fuel terminals and deliver it to the e-Bio plant. There, it was pumped into storage tanks and later transferred to another truck for delivery to e-Bio's customers. E-Bio furnished drivers delivering this product with paperwork reciting that the fuel they were carrying was RIN-valued B100, produced at the e-Bio plant. To cut down transportation costs, e-Bio eventually had truck drivers carry the biodiesel directly from Caravan's fuel terminals to e-Bio's customers. The company would fax fake paperwork, including false bills of lading, to the drivers while they were en route in order to make it appear as if the fuel had been produced at (and delivered from) the e-Bio plant. These

deliveries were called "Ghost Loads," because the drivers of those loads were never seen at the e-Bio plant.

While negotiating the acquisition of e-Bio, Craig informed Mr. Wilson that the e-Bio plant was not producing biodiesel from feedstock and that it was purchasing fuel from Caravan. Shortly after Imperial acquired e-Bio, Craig emailed Mr. Wilson a spreadsheet entitled "e-Biofuels make versus buy cost 6-16-2010.xls" (the "Make vs. Buy spreadsheet").[5] This spreadsheet compared the cost of making biodiesel from scratch versus the profit of buying it from Caravan. At one point, Mr. Wilson asked Craig how e-Bio could increase its output under the latter option, and Craig told Mr. Wilson that e-Bio's main customer would purchase as much biodiesel as e-Bio could sell.

The parties disputed at trial the degree of Mr. Wilson's involvement in e-Bio's business. The evidence showed that the Duceys continued to oversee many of e-Bio's daily operations after the Imperial acquisition, and Mr. Wilson maintained that he was largely unaware of e-Bio's day-to-day operations. According to him, he purchased the company because it came with a self-sufficient group of managers. There was, however, significant evidence about Mr. Wilson's involvement in and awareness of e-Bio's activities, as set out in the following paragraphs.

A few months after the acquisition, Mr. Wilson exchanged emails with his son and Chad, both of whom were working at the e-Bio plant. Chad stated that e-Bio was not producing any glycerin, a necessary by-product of transesterification (the process that converts feedstock into biodiesel). Mr. Wilson

---

[5] Tr. Ex. 3 (Make vs. Buy spreadsheet).

replied with his understanding that a lack of glycerin meant e-Bio was not producing biodiesel from feedstock. His son confirmed this conclusion. Around the same time, Mr. Wilson told the managers of Caravan that he wanted to increase their business together.

In November 2010, Imperial filed its first annual report with the SEC. In that report, Mr. Wilson represented that e-Bio manufactured millions of gallons of biodiesel from feedstock, that it produced glycerin as a by-product of this production process and that it took advantage of RINs that are generated when biofuel is produced. The following year, Mr. Wilson filed another annual report, three quarterly reports, and two current reports with the SEC. All of these documents included the same or similar statements representing that e-Bio produced biofuel from feedstock rather than buying and reselling biodiesel produced by a third party. Mr. Wilson certified the accuracy of the annual and quarterly reports even though they included false statements about e-Bio's production process and output. Mr. Wilson communicated similar statements to Imperial's outside accountant and its investors.

During Mr. Wilson's tenure as president of Imperial, e-Bio increased its fraudulent fuel sales substantially. It was able to increase its output by undertaking more and more Ghost Loads, especially in the Houston area.[6] The Government's witnesses testified that Mr. Wilson knew of these Ghost Loads and wanted to increase them by sending more drivers to

---

[6] These Texas Ghost Loads were uniquely risky because the trucks never traveled out of the state; they picked up fuel from terminals in Houston and delivered it to customers in Houston, even though the biodiesel was purportedly produced at e-Bio's plant in Indiana.

Texas. Mr. Wilson also had discussions about ways to mitigate the risks posed by the Ghost Loads. For instance, he favored bribing e-Bio's truck drivers so they would not expose the true nature of their deliveries, and he agreed to purchase a fax machine to transmit falsified paperwork directly to the drivers rather than by using an intermediary. He also was present during discussions about removing e-Bio's name from the trucks to deflect any suspicions about the deliveries.

During one audio-recorded meeting, Furando explained that the conspirators referred to the entire scheme as Alchemy. He also said: "Big oil does not care. … The RINs you guys generate, they don't care if they're real or not. They just want an obligation met. And they want to be done with it."[7] The parties dispute whether Mr. Wilson attended this meeting. During trial, three witnesses testified that they were at the meeting along with Mr. Wilson. A fourth witness identified a voice in the recording as that of Mr. Wilson; Mr. Wilson's brother disputed that identification. The jury had separate exemplars of Mr. Wilson's voice to compare with the recording.

In summer 2011, a hedge fund, Platinum Partners ("Platinum"), considered investing in Imperial. David Steinberg, an investment professional at Platinum, evaluated Imperial as a potential investment. Ashley Player, a renewable energy consultant whom Platinum had hired to conduct due diligence on Imperial, assisted him. As part of her investigation, Player inquired as to how e-Bio's 15-million-gallon-per-year plant could produce 25–30 million

---

[7] Tr. Ex. 148 (transcript of recorded meeting on July 27, 2011), at 2–3.

gallons of biodiesel per year. Chad told her that about half of e-Bio's output came from reprocessing "off-spec" biodiesel (*i.e.*, biodiesel that fails to meet one or more industry specifications). The other 15 million gallons, he told her, were produced from feedstock. Platinum Partners did not invest in Imperial.

Around this same time, Mr. Wilson was attempting to activate the production equipment at the e-Bio plant. Investors were requesting to visit the plant, but Mr. Wilson was not willing to host them until the plant could process genuine feedstock. Mr. Wilson ran into difficulties getting the plant up and running, and he eventually resigned from his position.

During Imperial's ownership of e-Bio, the subsidiary generated 99 percent of Imperial's revenues. Overall, e-Bio resold over 35 million gallons of biodiesel and realized more than $55 million in profits as a result of Alchemy. As e-Bio generated more and more revenue, the value of Imperial's stock rose as well. Mr. Wilson and his wife transferred hundreds of thousands of Imperial shares during this time, and Mr. Wilson issued more than $1 million in Imperial shares to different companies that he controlled. He also paid off more than $5 million in company debts using Imperial stock and wrote more than $100,000 in company checks to himself. These payments were not disclosed in Imperial's SEC filings and run counter to Mr. Wilson's statements in SEC reports that he had deferred his salary. When the scheme fell apart, Imperial's stock lost almost all of its value, and investors lost more than $18 million.

In June 2012, Government agents interviewed Mr. Wilson as part of an investigation into whether Imperial's SEC filings

contained false statements about e-Bio's production of biodiesel. When confronted with questions from investigators, Mr. Wilson repeated the explanation that Chad had given to Ashley Player: he told them that at least half of e-Bio's output was produced from feedstock at the company's EPA-registered plant, and that the other half was made by reprocessing off-spec biodiesel. Mr. Wilson also told the investigators that: (1) he never compared the cost of off-spec biodiesel to feedstock; (2) he did not compare the costs of reprocessing off-spec methyl ester to making biodiesel from feedstock; and (3) he did not know if reprocessing off-spec methyl esters was more profitable than making biodiesel from feedstock.

## B. District Court Proceedings

In September 2013, the Government filed a twenty-one-count indictment alleging that Mr. Wilson had committed the following offenses: fraud in the purchase or sale of securities (Count 1); fraud in the offer or sale of securities (Count 2); material false statements in required SEC filings[8] (Counts 3–9); wrongful certifications of annual and quarterly reports[9] (Counts 10–14); material omissions and false statements to a public company's independent accountant[10] (Counts 16–17

---

[8] Specifically, Imperial's Annual Reports for 2010 and 2011, its Quarterly Reports for the first three quarters of 2011, and its Current Reports for September and October of 2011.

[9] The same Annual and Quarterly Reports as above.

[10] Specifically, omissions and statements related to Imperial's annual audits in 2010 and 2011.

and 19–20); and false statements to Government investigators (Count 21). Craig was charged as a co-defendant.[11] He pleaded guilty prior to the trial and testified against Mr. Wilson. Chad, Chris, Carmichael, Furando, and Katirina Pattison (the original Alchemy conspirators) were all charged separately and also pleaded guilty. During Mr. Wilson's trial, the Government presented testimony from multiple participants in the Alchemy scheme, including Craig, Pattison (the second in charge of Caravan), and Alexander Chepurko (an employee of Caravan). The Government also presented testimony from Scott Hlavacek, an accountant for the SEC. Mr. Wilson did not testify.

The district court conducted an eight-day jury trial between July 11, 2016, and July 20, 2016. At the close of evidence, Mr. Wilson filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(a). After the court denied the motion, the jury found him guilty on all counts.

After the verdict, Mr. Wilson filed a Rule 29(c) motion for a renewed judgment of acquittal.[12] He argued that the Government had failed to adduce sufficient evidence to prove beyond a reasonable doubt that he had the requisite *mens rea* to commit the charged offenses. Although he did not dispute the existence of the Alchemy scheme, Mr. Wilson claimed that he was not aware of it at the time of his alleged offenses.

---

[11] Counts 15 and 18 charged only Craig.

[12] The Defendant's motion cited Rule 29(a), but the district court properly treated it as a Rule 29(c) motion. Rule 29(a) governs motions for judgment of acquittal made before a case is submitted to a jury, whereas Rule 29(c) governs similar motions filed after a verdict of guilty.

Therefore, he argued, the Government could not prove that he possessed the knowledge needed to convict him on any counts. The district court denied the motion for acquittal.

The court sentenced Mr. Wilson in December 2016. On Counts 1, 3–14, 16–17, and 19–20, it imposed concurrent sentences of 120 months' imprisonment. On Counts 2 and 21, the court imposed concurrent sentences of 60 months' imprisonment. These latter sentences were to run concurrently with the 120-month sentences. The court also ordered $16,468,769.73 in restitution and a $1,900 assessment. Mr. Wilson timely appealed.


## II

## DISCUSSION

Mr. Wilson asks that we review the district court's denial of his motion for judgment of acquittal. The principles that govern our review are well-settled. We review the trial court's ruling on a Rule 29 motion for a judgment of acquittal de novo. *United States v. Doody*, 600 F.3d 752, 754 (7th Cir. 2010). Like the district court, we ask "whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government." *United States v. Blasco*, 581 F.2d 681, 684 (7th Cir. 1978) (alteration in original) (internal quotation marks omitted). We must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *Id.*

We have framed this inquiry as "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Roman*, 728 F.2d 846, 857 (7th Cir. 1984) (emphasis in original) (internal quotation marks omitted). When a defendant has introduced evidence in his own defense at trial, we examine the evidence as a whole, including that presented by the defendant. *See United States v. Fearn*, 589 F.2d 1316, 1321 (7th Cir. 1978). In a case that hinges on circumstantial evidence, we must not permit a verdict based "solely on the piling of inference upon inference," but we also must not "rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference." *Roman*, 728 F.2d at 858 (internal quotation marks omitted).

Mr. Wilson maintains that he was unaware of the Alchemy scheme and therefore lacked the requisite *mens rea* to be convicted on any charges. In response, the Government notes that it did not need to prove that Mr. Wilson knew about the entire Alchemy scheme (specifically, the double incentives that e-Bio generated through falsified paperwork) in order to prove his guilt. Rather, it needed to prove only that he knowingly made false statements to regulators, investors, investigators, and an outside accountant. The Government also contends that it presented sufficient evidence showing that Mr. Wilson knew about and directly participated in the Alchemy scheme.

Upon examination of the record, we must conclude that
Mr. Wilson has failed to overcome the very significant hurdle
that faces a defendant on a Rule 29(c) motion. *See United States
v. Tucker*, 737 F.3d 1090, 1092 (7th Cir. 2013) (discussing the
high bar that faces an appellant raising an insufficiency
challenge). Viewed in the light most favorable to the
prosecution and without questioning the jury's credibility
determinations, the evidence is more than sufficient to sustain
a conviction on all counts. We now turn to a specific
examination of each of the charges.

**1. Counts 1 through 14**

Counts 1 through 14 all require the Government to prove
essentially the same thing: that Mr. Wilson knowingly and
willfully made untrue statements of material fact—or omitted
material facts in a manner that was misleading—in the
purchase, offer, or sale of securities and in required SEC
filings. Mr. Wilson has not contested the other elements of
charges 1 through 14. In support of the district court's ruling,
the Government invites our attention to trial testimony and
exhibits indicating that Mr. Wilson knew the e-Bio plant was
not manufacturing biodiesel but rather buying it from a third
party. If Mr. Wilson indeed knew these facts, then his
contrary statements to Imperial investors, accountants, and
the SEC were materially false.

As the district court noted, the evidence at trial established
that Mr. Wilson made the following representations: (1) e-Bio
manufactured millions of gallons of biodiesel at its own plant;
(2) the e-Bio plant used transesterification to convert raw
feedstock into biodiesel; (3) the transesterification process

required e-Bio to purchase methanol and raw feedstock; and (4) e-Bio produced and sold glycerin, a necessary by-product of transesterification. Mr. Wilson does not challenge whether he made these representations or whether they are false. Instead, he claims ignorance in order to challenge the "knowing" and "willful" aspect of his false statements.

To show that Mr. Wilson knew these representations were false and thus acted "knowingly and willfully," the Government points, in part, to the following evidence:

- Craig's testimony that prior to the Imperial acquisition he told Mr. Wilson the plant was not producing biodiesel.

- The Make vs. Buy spreadsheet, which Craig emailed to Mr. Wilson illustrating that it was more profitable to buy and resell biodiesel rather than manufacture it from feedstock.

- Craig's testimony that he discussed the Make vs. Buy spreadsheet with Mr. Wilson, who inquired about increasing output of the "bottom product" (*i.e.*, the product resulting from buying and reselling biodiesel).

- Mr. Wilson's multiple visits to the e-Bio plant, where nothing was hidden from him, including the dormant state of the plant's production equipment or the deliveries of biodiesel to and from storage tanks.

- Chepurko's testimony that Mr. Wilson told Furando the e-Bio plant was not operating, and Pattison's testimony that she and Mr. Wilson discussed the difficulties of getting it operational again.

- Mr. Wilson's receipt of an email about the lack of

glycerin produced at the plant and his recognition in response that e-Bio must not have been making its own biodiesel.

In the face of this evidence, Mr. Wilson submits that he did not know about the Alchemy scheme and that his false representations were made in good faith. He emphasizes the undisputed fact that the Alchemy cover-up started before Imperial acquired e-Bio and maintains that "common sense dictates[ that] the Duceys had no incentive to disclose the Alchemy scheme to" him.[13] Mr. Wilson also compares his asserted ignorance with the knowledge of Scott Hlavacek, an SEC accountant who spent three years tracking and analyzing e-Bio's Ghost Loads to uncover the fraud. Mr. Wilson argues that he could not have discovered the fraud on his own, given his lack of knowledge about the industry and lack of access to the documents used by Hlavacek.

None of these arguments show that the Government's evidence was insufficient as a matter of law. Although one can argue that the Duceys would not have disclosed their fraud to Mr. Wilson, a reasonable jury could have found otherwise. The jury might have concluded, for example, that the Duceys disclosed the illegal venture to Mr. Wilson because they were sure that he eventually would discover it on his own and thought it better to convince him to join their scheme rather than report it. Mr. Wilson's argument about Hlavacek is also deficient: the prosecution did not suggest that Mr. Wilson discovered the fraud through a longitudinal investigation like that conducted by Hlavacek. Rather, the Government suggested that Wilson was told about the

---

[13] Appellant's Br. 23.

scheme directly by co-conspirators. Therefore, it does not matter if Mr. Wilson "did not have the time or the resources to conduct the same analysis [as] Hlavacek."[14]

The Government also presented evidence that Mr. Wilson knew about and directly participated in the Alchemy scheme. Specifically, the Government points to an audio tape of a secretly recorded meeting during which Furando explained that the scheme is called Alchemy and that "Big oil does not care" if the RINs are real so long as its regulatory obligations are met.[15] Multiple witnesses testified that Mr. Wilson was present at this meeting and identified a voice on the tape as his. And the jury was able to compare the tape recording to a separate exemplar of Mr. Wilson's voice. Given the reasonable inferences that could be drawn from this evidence, it was not irrational for the jury to conclude that Mr. Wilson was aware of the Alchemy scheme.

The Government also identifies evidence that Mr. Wilson knew about and actively tried to cover up the Ghost Loads. It points to testimony that Mr. Wilson had discussions with Craig and Furando about the Ghost Loads and ways to mitigate the risks by removing e-Bio's name from the trucks, bribing truck drivers, and providing a fax machine for the drivers to receive falsified documents. The Government also notes a number of documents in Mr. Wilson's possession that evidenced the Ghost Loads, such as falsified bills of lading, invoices that e-Bio issued to Caravan, and spreadsheets analyzing the profitability of Ghost Loads. Although this documentary evidence does not necessarily conflict with

---

[14] *Id.* at 25.

[15] Tr. Ex. 148, at 2–3.

Mr. Wilson's claim that he was ignorant of its incriminating nature, it does provide additional evidence from which a rational jury could infer that Mr. Wilson knew about the Ghost Loads and the broader scheme.

### 2. Counts 16–17 and 19–20

Mr. Wilson also challenges the sufficiency of the Government's evidence showing that he knowingly and willfully made materially false or misleading statements to, or omitted material facts from, an accountant in connection with the preparation and filing of reports for the SEC. In particular, he challenges the Government's contentions that he lied when he told John Samyn, an accountant hired by Imperial, that (1) he was unaware of any allegations of fraud or suspected fraud affecting Imperial or its subsidiaries; (2) he had provided Samyn with all the records regarding the business of Imperial and its subsidiaries; and (3) he had provided Samyn with all minutes and summaries of meetings by Imperial's Board of Directors.

Mr. Wilson addresses only the first contention. He claims that he did not hide any allegations of fraud or suspected fraud from Samyn. Specifically, Mr. Wilson emphasizes that he did not receive a written report from Ashley Player, the outside consultant hired by Platinum, questioning the validity of the RINs generated by e-Bio. Absent such a report, Mr. Wilson argues, he could not have disclosed its contents to Samyn.

Although a written report would have enhanced the probity of the Government's evidence, it hardly precludes the reasonable conclusion that Mr. Wilson knew about Player's

suspicions and failed to disclose them to Samyn. The Government provided adequate evidence for the jury to conclude that Mr. Wilson was aware of such third-party suspicions. It cited, for instance, an email between Mr. Wilson and Steinberg, an investment professional for Platinum, in which Mr. Wilson recognized Player's concern that e-Bio's products were not eligible for RINs.[16]

Mr. Wilson also notes that Steinberg told him that Platinum was not accusing Imperial of criminal conduct. Again, although such an accusation would have enhanced the Government's case, its absence does not overcome the other evidence that Mr. Wilson knew about Player's suspicions. The Government did not need to establish definitely that Steinberg accused Imperial of fraud; it merely needed to present evidence from which a reasonable jury could conclude that Mr. Wilson knew about suspicions of fraud and did not disclose them to Samyn.

Finally, Mr. Wilson argues that he was not required to disclose to Samyn a particular allegation, made by an outside consultant, that the Ducey brothers were selling fuel at below-market prices to a former principal of e-Bio. Mr. Wilson argues that he was not required to disclose this allegation to Samyn because he had looked into it and had

---

[16] In this particular email exchange, Mr. Wilson refers to the "off[-]spec products [that e-Bio was] purchasing as feedstocks." Tr. Ex. 68, at 2. Off-spec biodiesel is different from the RIN-less B99 that e-Bio was actually purchasing from Caravan; however, as Player explained in her testimony, it is still odd for a biodiesel production plant to use off-spec fuel when generating RIN-valued B100. *See* R.168 at 232–34 (Trial Tr. vol. 3 at 617–19).

determined that it was baseless. However, the evidence shows that Samyn asked Mr. Wilson about "*any allegations* of fraud or suspected fraud"—not just well-supported allegations.[17] The Government also presented an August 2011 communication between Mr. Wilson and Imperial's Board of Directors, in which Mr. Wilson detailed the allegations above. Given Mr. Wilson's recognition that the allegations warranted a report to the Board, the jury reasonably could have concluded that he knowingly failed to disclose them to Samyn in the fall of 2011.

Furthermore, aside from broad claims that he was unaware of Alchemy, Mr. Wilson does not challenge the Government's evidence that he failed to give Samyn all of Imperial's pertinent business records and board meeting minutes. For instance, the Government introduced minutes from an August 2011 board meeting where Mr. Wilson discussed the allegations of fraudulent transactions between e-Bio and a former principal. In conjunction with those minutes, the Government also introduced a letter from October 2011, in which Mr. Wilson certified to Samyn's accounting firm that he had provided it with all minutes from Imperial's director meetings. This documentation provided further evidence from which the jury could infer that Mr. Wilson acted knowingly and willfully when making materially false statements to an outside accountant.

---

[17] Tr. Ex. 85 (Imperial Fraud Risk Information Form dated September 5, 2011), at 3 (emphasis added); *see also* Tr. Ex. 104 (Imperial Management Certification Letter dated October 21, 2011), at 2 (representing that Imperial had "no knowledge of any fraud or suspected fraud").

### 3. Count 21

The last count charged Mr. Wilson with knowingly and willfully making false statements to Government agents, in violation of 18 U.S.C. § 1001. The Government identified three specific statements made by Mr. Wilson during an interview by federal investigators on May 29, 2012: (1) that he never compared the cost of off-spec biodiesel to feedstock; (2) that he did not compare the cost of reprocessing off-spec methyl ester to making biodiesel from feedstock; and (3) that he did not know if reprocessing off-spec methyl ester was more profitable than making biodiesel from feedstock. Mr. Wilson does not challenge whether he made these statements; rather, he argues that they were not technically false.

To prove the falsity of these statements, the Government primarily relies on the Make vs. Buy spreadsheet that Mr. Wilson received from Craig. Mr. Wilson does not challenge whether the contents of the spreadsheet include the comparisons above. He instead argues that his receipt of the spreadsheet does not prove that he actually read it or "personally contemplated the comparisons."[18] He also claims that the Government did not prove that he remembered receiving the spreadsheet at the time he was interviewed because the Government did not ask him specifically about receiving it.[19] Mr. Wilson relies upon our opinion in *United*

---

[18] Appellant's Br. 14.

[19] Mr. Wilson also points out that "the price of feedstock was variable, so it is entirely possible there were times when it was more profitable to make biodiesel from feedstock than reprocessing off-spec methyl ester." *Id.* at 36. Although this may be true, it does not conflict with the Government's evidence that Mr. Wilson compared the profitability of the two processes.

*States v. Rahman*, 805 F.3d 822 (7th Cir. 2015), to argue that,
technically, he did not lie.

In *Rahman*, a restaurant owner was convicted of falsely
telling a Government agent that his laptop, which contained
business records, was in his restaurant when the building
burned down. 805 F.3d at 837. Because the Government later
uncovered a laptop without business records at the
defendant's home, the jury concluded that the defendant had
lied. We reversed the conviction on appeal, noting the
ambiguity in the Government's question and resultant
insufficiency of the evidence showing that the defendant had
lied. Specifically, the Government had failed to ask whether
the defendant owned multiple laptops and, if so, which ones
were in his restaurant during the fire. It was not unlikely that
the defendant had a laptop with business records at work and
another laptop for personal use at home. Therefore, we held
that the Government did not establish beyond a reasonable
doubt that, when questioned by the agents, the defendant had
been referring to the laptop that was later found in his home.
*Id.* at 839.

Mr. Wilson attempts to compare his situation to that of the
defendant in *Rahman*. He argues that the Government should
have asked more specific questions, such as whether he
analyzed and recalled the cost comparisons reflected in the
Make vs. Buy spreadsheet. But the Government's inquiries
here did not elicit any ambiguity comparable to the ambiguity
in *Rahman*. Even if Mr. Wilson did not personally run the
analysis measuring the individual costs of making versus

---

Indeed, a jury could conclude that variable prices are precisely the kind of
factor that would motivate a business to run cost comparisons.

buying/reselling biodiesel, the jury reasonably could have concluded that, using this specific spreadsheet, he "compared" the two processes. This conclusion was supported by ample circumstantial evidence. *See United States v. Trudeau*, 812 F.3d 578, 590 (7th Cir. 2016) (noting that circumstantial evidence may be used to establish a defendant's state of mind), *cert. denied*, 137 S. Ct. 566 (2016). In addition to the Make vs. Buy spreadsheet, the Government presented testimony from Craig that he discussed the contents of the spreadsheet with Mr. Wilson and that Mr. Wilson asked him how to obtain more gallons of the "bottom product" (*i.e.*, the product obtained via the buy/resell scheme).[20]

Finally, Mr. Wilson challenges the materiality of his false statements but offers very little by way of support. He emphasizes that the investigators failed to ask him whether he recalled the Make vs. Buy spreadsheet during his interview. Mr. Wilson seems to argue that because the investigators did not call his attention to the spreadsheet, his "alleged statements in the interview were not connected to the spreadsheet" and thus were not material.[21]

This argument misconstrues the concept of materiality. The true test for materiality under § 1001 is whether the statement in question had a "natural tendency to influence, or [was] … capable of influencing" the federal agency. *United States v. Dick*, 744 F.2d 546, 553 (7th Cir. 1984); *United States v. DiFonzo*, 603 F.2d 1260, 1266 (7th Cir. 1979). Mr. Wilson's statements to Government agents clearly had a "natural

---

[20] R.169 at 215 (Trial Tr. vol. 4 at 896).

[21] Appellant's Br. 38.

tendency" to influence their investigation of Imperial. The agents were investigating whether the company's representations to the SEC about its production of biodiesel were true. If Mr. Wilson, as the CEO of Imperial, acknowledged that he had compared the costs of producing biodiesel to the costs of buying and reselling it, that disclosure certainly would have affected the investigation. One of the investigators confirmed as much in her testimony.[22] Therefore, the jury was entitled to conclude that Mr. Wilson's statements were material.

**CONCLUSION**

Mr. Wilson's claim that the Government did not present evidence sufficient to support his conviction fails to overcome the substantial burden facing a defendant who challenges a jury's verdict. He maintains that he was unaware of the Alchemy scheme and that he made any false statements in good faith. His arguments merely demonstrate that the jury could have drawn contrary inferences, but that is not enough to overturn his conviction.

The Government has pointed to ample circumstantial evidence that Mr. Wilson knew about the Alchemy scheme, or at least knew that e-Bio was not producing its own biodiesel through transesterification. Based on this evidence, a rational jury could have concluded that Mr. Wilson

---

[22] R.171 at 75–76 (Trial Tr. vol. 6 at 1270–71) (testimony by Lorna Eagle, a special agent for the Internal Revenue Service, that truthful answers by Mr. Wilson would have been important to the Government's investigation and would have demonstrated "his knowledge of what was going on and his motive or the motive of the plant").

knowingly and willfully told false statements to investors, accountants, investigators, and the SEC. It was up to the jury to evaluate the witnesses' credibility, weigh the evidence, and draw reasonable inferences. That it did, and we will not disturb its finding.

Accordingly, the judgment of the district court is affirmed.

AFFIRMED