In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 17-1391

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOSE JAIME LOPEZ,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:16-cr-20004-1 — **Colin S. Bruce**, *Judge.*

---

ARGUED SEPTEMBER 26, 2018 — DECIDED OCTOBER 24, 2018

---

Before EASTERBROOK, ROVNER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* A jury convicted Jose Jaime Lopez of
several drug-related offenses and the district court sentenced
him to life in prison. In this direct appeal, Lopez challenges
the denial of his motion to suppress, the sufficiency of the ev-
idence on his conviction for attempting to possess with the
intent to distribute 50 grams or more of methamphetamine,
and his sentence of life in prison. We affirm both Lopez's con-
viction and sentence, though we again remind district courts

and the government to ensure compliance with the requirements of 21 U.S.C. § 851.

## I. Background

Beginning in late September 2014, law enforcement agents intercepted communications over a cellular telephone pursuant to a Maryland state court order revealing that Heliodoro Moreno, through courier George Salinas, planned to transport to Lopez a large quantity of illegal drugs from Texas to Illinois. Lopez arranged for his friend Andrew Linares to pick up the illegal drugs from Salinas and bring them to him. Law enforcement intercepted the illegal drugs at an Illinois bus stop, arresting Salinas and Linares and seizing 10 ounces of methamphetamine from Salinas. By 2015, the government developed a source who engaged in three controlled purchases of illegal drugs from Lopez, who law enforcement later arrested and charged in this case with several drug crimes.

## A.

On February 4, 2016, a federal grand jury indicted Lopez on numerous drug-related offenses including, pertinent here, that on or about October 1 to October 3, 2014, Lopez knowingly attempted to possess 50 grams or more of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii). Lopez entered a plea of not guilty to all counts charged in the indictment.[1]

---

[1] Though not relevant to this appeal, the indictment additionally charged Lopez with one count of distributing a mixture and substance containing cocaine, two counts of distributing methamphetamine, and one count of possession with intent to distribute a mixture and substance containing cocaine.

Prior to trial, on July 11, 2016, Lopez moved to suppress two cellular telephone calls—one between Moreno and a confidential source and another between Lopez and Moreno. The government intercepted the calls pursuant to a Maryland state court order authorizing law enforcement to intercept communications from a cellular telephone that Moreno was using in Texas, based on information that he was supplying illegal drugs to traffickers in Baltimore. In moving to suppress, Lopez argued that the order violated 18 U.S.C. § 2518(4)(b) by failing to specify "the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted," and further that law enforcement intercepted communications falling outside of the state's territorial jurisdiction.

The district court denied Lopez's motion, concluding that the court order complied with § 2518(4)(b) because it "identified the nature and location of the intercepted cellular telephone" and "specified the place where authority to intercept was granted." The court also found that law enforcement's listening post was located in Maryland and law enforcement heard all the intercepted conversations in Maryland.[2]

On October 24, 2016, about a week before trial, the government filed an information pursuant to 21 U.S.C. § 851 notifying Lopez that it intended to rely on two prior drug convictions to enhance his sentence to life in prison under 21 U.S.C. § 841(b)(1)(A)(viii). One of the convictions stemmed from a 1999 Texas state felony marijuana possession charge to which

---

[2] The district court additionally held, as to the first intercepted call, that since Lopez was not a party to the call, he lacked standing to challenge it under 18 U.S.C. § 2518(10)(a). Lopez does not appeal this ruling.

Lopez had entered a plea of guilty and received a deferred adjudication that he successfully completed.

## B.

### 1.

The case proceeded to trial on November 1, 2016. During trial, the jury heard from 17 witnesses, including Salinas, who testified about his transportation of methamphetamine via bus from Texas to Illinois and his communications with Lopez and Moreno; Linares, who testified about the instructions he received from, and the communications with, Lopez relating to picking up Salinas with the drugs from the bus stop in Illinois and bringing him to Lopez; Special Agent Joe Green, who testified about the events surrounding the receipt of information about Salinas' transportation of drugs from Texas to Illinois and the arrest of Salinas and Linares; and other law enforcement officers. The government additionally presented many exhibits, including intercepted phone calls, extracted data from Salinas' and Linares' cell phones; the methamphetamine that Salinas transported from Texas to Illinois; and various items seized from Lopez's Illinois home pursuant to a federal search warrant, including, among other things, address books with contact information for Salinas and Linares, five digital scales, ingredients that can be used as current agents for cocaine and methamphetamine, and two heat sealers that can be used to package illegal drugs.

### 2.

On September 27, 2014, pursuant to the Maryland state court order, agents of the Drug Enforcement Agency ("DEA") intercepted a telephone call between Moreno and an individ-

ual using telephone number (217) xxx-8124 (the "217 Number"), that the government and several witnesses identified as Lopez. On the call, Moreno asked Lopez if he could "promote" "whiskey" where he lived, and Lopez answered "a lot is moved around here." Moreno and Lopez discussed a transaction involving "onions" and "whiskey" at $1,000 per "onion." Law enforcement agents testified that the discussion was about a drug transaction involving ounces ("onions") of a controlled substance ("whiskey") at $1,000 per ounce.

On the call, Moreno confirmed that Lopez knew Salinas—the eventual drug courier—and told Lopez that Salinas would contact him. Salinas had known Lopez for more than six years and had twice traveled to Illinois to bring Lopez "a little bit of weed." On September 28, 2014, Salinas and Lopez spoke about Salinas "bringing a package up" from Texas to Illinois.

Over the next three days, Moreno, Salinas, and Lopez made plans for Salinas to travel by bus from Houston to Illinois to deliver "ten little onions" to Lopez. Salinas would remain in Illinois until he received $4,000 in partial payment from Lopez, which Lopez thought would take him a few days to obtain. Lopez would then "work it, get rid of it" and settle the remaining balance with Moreno. As part of the plan, Lopez asked his friend Linares to pick up Salinas at the bus stop and Linares agreed to do so.

On the morning of October 2, 2014, Salinas arrived at a Houston bus station where one of Moreno's workers took him to pick up a cellophane-wrapped package that Salinas then hid in his crotch area before boarding the bus bound for Rantoul, Illinois, a town near Lopez's hometown of Hoopeston, Illinois. Salinas periodically sent text messages

and spoke to Lopez during the nearly 24-hour bus trip that followed, updating Lopez on the progress of his trip.

On October 3, 2014, Linares was waiting at the Rantoul bus stop for Salinas' arrival. Linares, who knew Salinas only by the nickname "old man," had met him through Lopez on Salinas' past trips to Illinois. Earlier that morning, Lopez reminded Linares to pick up Salinas and informed Linares of the status of the Salinas' bus, confirmed the pick-up location ("the usual Walmart"), and directed him where to take Salinas ("to town," meaning Lopez's home).

When Linares arrived at the bus stop on October 3, 2014, he sent a text message to Lopez stating, "I'm here looks all clear," to which Lopez responded, "Cool … . see you in a bit." Salinas informed Lopez via text message when the bus arrived. Lopez responded that Linares is at the bus stop and instructed Salinas not to say anything.

Law enforcement agents were also at the bus stop. On October 2, 2014, the day prior, Baltimore DEA agents had informed their Illinois counterparts about incepted phone calls revealing that illegal drugs were being transported from Texas to Illinois. By that evening, after obtaining a federal search warrant for prospective cell phone location data, the Illinois DEA agents used cellular location data and physical surveillance to identify the bus on which Salinas was traveling and then followed the bus to Rantoul.

The law enforcement agents arrested Salinas and Linares after Salinas exited the bus and entered Linares' car. Salinas gave them the package which a forensic chemist later determined contained 276.4 grams of a methamphetamine mixture

with a purity level of 99.5%. While in custody, Salinas and Linares consented to searches of their cell phones, which yielded text messages to and from Lopez about the planned drug transaction and call records showing multiple attempted calls from Lopez after their arrest. Linares' phone had contact information for "Jose L" at the 217 Number, whom he would later testify was Lopez. Salinas' phone likewise had contact information for "Jose Lopez" at the 217 Number.

Law enforcement waited to arrest Lopez. By fall 2015, agents had completed three controlled buys of illegal drugs, including methamphetamine, from Lopez. Then, in early January 2016, law enforcement executed a search warrant on Lopez's home, seizing, among other things, address books with contact information for Salinas and Linares, five digital scales, ingredients that can be cutting agents for cocaine and methamphetamine, and two vacuum heat sealers and related packaging materials that can be used to package illegal drugs.

## C.

Following the three-day trial, the jury found Lopez guilty on all counts. It also found on a special verdict form that the offense involved 50 grams or more of methamphetamine.

The district court subsequently held a sentencing hearing at which Lopez's sole objection to the Presentence Investigation Report ("PSR") was its reliance on his 1999 guilty plea in Texas state court to enhance his sentence to mandatory life in prison. In short, Lopez contended that the guilty plea was not a "conviction" for purposes of § 841(b)(1)(A)(viii) because he pleaded guilty and received a deferred adjudication that he successfully completed. Lopez further argued that his counsel

for the plea gave him faulty advice about the collateral consequences of pleading guilty at that time.

Without engaging in the colloquy or providing the admonition required by § 851(b), the district court overruled Lopez's objection based on two cases from the Fifth Circuit: *United States v. Fazande*, 487 F.3d 307 (5th Cir. 2007) (per curiam) and *United States v. Cisneros*, 112 F.3d 1272 (5th Cir. 1997). The court then adopted the PSR and sentenced Lopez to mandatory life in prison under § 841(b)(1)(A)(viii) and a concurrent sentence of 188 months in prison.

## II. Discussion

On appeal, Lopez makes three basic arguments: *first*, that the district court improperly admitted certain intercepted communications; *second*, that the government failed to prove beyond a reasonable doubt that he attempted to possess with intent to distribute 50 grams or more of methamphetamine; and *third*, that the district court erred in sentencing him to life in prison. We consider each challenge.

## A.

We first take up Lopez's argument that the district court erred "by allowing the government to present evidence that violated Lopez's Fourth Amendment rights and did not meet the requirements of 18 U.S.C. § 2518." Essentially, Lopez claims that the government introduced intercepted communications at trial to prove that he was communicating with Moreno in Texas and posits that "if" the law enforcement agents were located outside of Maryland when they intercepted the communications at issue, then the communications were obtained unlawfully under § 2518.

It is unclear whether Lopez is challenging the district court's denial of his pre-trial motion to suppress, for which we review legal questions *de novo* and factual questions for clear error, *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667 (7th Cir. 2018); or the admission of evidence at trial, for which we review for abuse of discretion if preserved or for plain error if not, *Walker v. Groot*, 867 F.3d 799, 805 (7th Cir. 2017). Either way the challenge fails.

The district court expressly found that the listening post was located in Maryland and Lopez did not argue otherwise below, *see United States v. Daniels*, 803 F.3d 335, 351–52 (7th Cir. 2015) (reiterating that suppression arguments made for the first time on appeal are waived absent good cause), and does not now identify any evidence to counter this finding or otherwise attempt to show that it was erroneous. Indeed, he merely speculates about the location of the listening post, while admitting that he failed to develop any record to support his claim. We therefore find no error in the district court's denial of Lopez's motion to suppress and reject any claim of evidentiary error at trial in this regard.

**B.**

We next address Lopez's sufficiency of the evidence challenge. "Appellants raising insufficiency challenges face 'a nearly insurmountable hurdle.'" *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (citations omitted). In approaching such a challenge, we ask "'whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) (citation omitted) (emphasis in original).

To sustain a conviction for possession of methamphetamine with intent to distribute, the government has to prove the following elements beyond a reasonable doubt: the defendant knowingly and intentionally possessed methamphetamine, he possessed methamphetamine with the intent to distribute it, and he knew the material was a controlled substance. *See United States v. Campbell*, 534 F.3d 599, 605 (7th Cir. 2008). To sustain the conviction for attempted possession with intent to distribute methamphetamine, the government had to prove beyond a reasonable doubt that Lopez acted with the specific intent to commit the underlying offense and took a substantial step toward completion of the that offense. *See United States v. Conley*, 875 F.3d 391, 398 (7th Cir. 2017). Lopez claims that the government failed to prove each element of the attempt charge.

**1.**

Lopez argues that we should vacate his conviction because the government did not prove beyond a reasonable doubt that he acted with specific intent. He does not focus on the jury's finding that he intended to possess methamphetamine, but instead focuses on distribution. We nonetheless address both and conclude that the evidence more than supports the jury's finding beyond a reasonable doubt that Lopez intended to possess and distribute at least 50 grams of methamphetamine.

First, on possession, the government presented more than sufficient evidence for the jury to find that Lopez intended to possess at least 50 grams of methamphetamine. Viewed in the light most favorable to the government, the evidence, including communication intercepts and the testimony of Salinas, Linares, and others, established that Lopez specifically agreed

and arranged with Moreno to receive a nearly 10 ounces (approximately 283 grams) of methamphetamine on October 3, 2014 through Salinas, a drug mule whom Lopez knew and from whom Lopez and had previously received illegal drugs. Salinas traveled by bus to bring the methamphetamine to Illinois, during which time Lopez was in contact with Salinas. Lopez arranged payment terms in advance and further arranged for his friend Linares to meet Salinas at the bus stop and bring Salinas to his home to provide the drugs to Lopez.

Second, on distribution, the government likewise presented sufficient evidence for the jury to find beyond a reasonable doubt that Lopez intended to distribute the at least 50 grams of methamphetamine he arranged to receive from Salinas. The evidence showed that 10 ounces of methamphetamine exceeds the amount an individual would have for personal use (which is about 1 gram), supporting the reasonable inference that Lopez intended to distribute it, rather than use it for himself, as several government witnesses, including an expert in controlled substances, testified. *See United States v. Baker*, 655 F.3d 677, 684 (7th Cir. 2011) (observing that "intent to distribute can be inferred from the possession of a quantity of drugs larger than needed for personal use"). Lopez additionally told Moreno that "a lot is moved here" in response to Moreno asking him if he could sell illegal drugs prior to Moreno sending Salinas to Illinois. Moreover, Lopez arranged to pay the balance for the drugs a few days after receiving the drugs, suggesting that he would sell some of the drugs to generate money.

Lopez's primary retort is to challenge the intercepted communications, arguing that there is not sufficient evidence to

link him to the communications. But that argument is unavailing. Although phone records did not show Lopez as the subscriber of the 217 Number, there was ample trial evidence that Lopez was the user of that number. Salinas and Linares had the number saved in their cellular telephones under Lopez's name and each testified that he used that number to communicate with Lopez and to coordinate and arrange the transaction. This is in addition to the user of the number stating that he lived "out here by Champaign," close to Lopez's home. Additionally, a police officer testified that, after taking Salinas and Linares into custody, the 217 Number called Linares phone and the officer recognized the caller's voice to be Lopez's. Even without the calls, however, the testimony of Salinas and Linares, together with other evidence, provides a solid evidentiary basis for the jury to find beyond a reasonable doubt that Salinas transported a 10 ounce package of methamphetamine to Illinois, that Lopez was the intended recipient of the package, that Lopez arranged for Linares to pick up Salinas at the bus, and that the package contained methamphetamine far in excess of a personal use amount.

**2.**

Lopez next asks us to vacate his conviction because the government failed to prove that he took a substantial step towards committing the underlying offense. "A substantial step is 'some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime.'" *United States v. Muratovic*, 719 F.3d 809, 815 (7th Cir. 2013) (citations omitted). "It requires 'something more than mere preparation, but less than the last act necessary before actual commission of the substantive crime.'" *Id.* (citation omitted). This is an "inherently fact

specific" inquiry. *See United States v. Sanchez*, 615 F.3d 836, 844 (7th Cir. 2010).

Here, the trial evidence establishes that but for the government's intervention Lopez would have received 10 ounces of methamphetamine that he planned to distribute. Although Lopez did not meet Salinas or Linares nor was he in the immediate vicinity of the bus station, the evidence nonetheless shows that he went well beyond the mere preparation stage. Lopez set in motion a complex plan that would have resulted in a large quantity of illegal drugs arriving at his home on October 3, 2014.

Indeed, in less than a week, Lopez agreed to buy a large quantity of illegal drugs from Moreno, and Salinas, at Moreno's direction, obtained 10 ounces of methamphetamine, communicated with Lopez about bringing illegal drugs to Lopez, and traveled from Texas to Rantoul—near Lopez's house—to meet Linares, who Lopez arranged to pick up Salinas at the bus stop and bring him to Lopez's home (and reminded him to do so on the morning of Salinas' arrival). Lopez also agreed to specific payment terms, methods, and timing. Further showing Lopez's resolve to commit the crime, he repeatedly attempted to contact Salinas and Linares after their arrest. Taken together, Lopez's actions constitute more than mere preparation or speech; they were a substantial step towards commission of the underlying drug offense.

## C.

We finally turn to Lopez's sentencing arguments. He contends that the district court erred in enhancing his sentence to life imprisonment because it improperly counted his 1999 guilty plea as a predicate "conviction" for purposes of

§ 841(b)(1)(A)(viii). Lopez also claims the court failed to comply with § 851(b) before enhancing his sentence and that the enhancement violates "due process and government policy."

We review claims of procedural error at sentencing *de novo*. *See United States v. Tounisi*, 900 F.3d 982, 987 (7th Cir. 2018) (per curiam); *see also United States v. Lockwood*, 840 F.3d 896, 900 (7th Cir. 2016). Where, as here, a sentencing enhancement is at issue, we review "the district court's determination of facts at sentencing for clear error, and its interpretation of the guidelines and other statutory enhancements *de novo*." *United States v. Brown*, 822 F.3d 966, 976 (7th Cir. 2016).

Section 841(b) "outlines the penalties for federal drug crimes based upon the quantity of drugs involved and the number of prior drug convictions." *Arreola-Castillo v. United States*, 889 F.3d 378, 385 (7th Cir. 2018). If a defendant has two or more prior felony drug convictions that have become final, and his federal offense involves at least 50 grams of methamphetamine, the enhanced sentence is mandatory life in prison. 21 U.S.C. § 841(b)(1)(A)(viii). Federal law, not state law, defines "conviction" for purposes of the enhancement. *United States v. Gomez*, 24 F.3d 924, 930 (7th Cir. 1994).

To impose the statutory enhancement under § 841, "the government must follow the procedures in 21 U.S.C. § 851." *Arreola-Castillo*, 889 F.3d at 384. The prosecutor first must file an information identifying the prior convictions. *See* 21 U.S.C. § 851(a). Then, "the court shall … inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." *Id*.

§ 851(b). If the person denies any allegation in the information, or claims a prior conviction is invalid, that person must file a written response. *Id*. § 851(c)(1). "Any challenge to a prior conviction, not raised by response to the information … , shall be waived unless good cause be shown for failure to make a timely challenge." *Id*. § 851(c)(2).

If the defendant files a response, "[t]he court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment." *Id*. § 851(c)(1). At the hearing, the parties may present evidence and request that the court make findings of fact and conclusions of law. *Id*. The government bears the burden of proof beyond a reasonable doubt on factual issues. *Id*.

In addition, § 851 provides that "'No person who stands convicted of an offense under this part may challenge the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction.'" *Arreola-Castillo*, 889 F.3d at 384 (quoting 21 U.S.C. § 851(e)). This limits challenges to the legal validity of the prior conviction, not challenges to its factual existence. *Id.*

**1.**

Lopez's primary argument is that the district court erred in counting his 1999 guilty plea in Texas as a conviction under § 841(b)(1)(A)(viii) to enhance his sentence. He explains that, after pleading guilty, the state court granted him a deferred adjudication and that he was discharged from probation in 2002, thus in his view disqualifying the offense from being a "conviction" under § 841(b)(1)(A)(viii). Though we are sympathetic to Lopez's plight, his claim fails under existing law.

To begin, the Fifth Circuit considered this precise issue—namely, "whether a deferred adjudication in Texas constitutes a 'prior conviction' in the context of 21 U.S.C. § 841(b)(1)(A)"—in *United States v. Cisneros*, 112 F.3d 1272, 1275 (5th Cir. 1997). The Circuit Court answered in the affirmative, relying heavily on *Dickerson v. New Banner Inst. Inc.*, 460 U.S. 103 (1993). We find the Fifth Circuit's reasoning persuasive and its reliance on *Dickerson* dispositive.

In *Dickerson*, the Supreme Court considered whether, as a matter of federal law, an individual had "been convicted" of a felony for purposes of evaluating his eligibility to possess a firearm under 18 U.S.C. §§ 922(g)-(h). The individual pleaded guilty in Iowa state court to carrying a concealed firearm, and the state court deferred entry of formal judgment and placed him on probation, after which the court discharged the defendant and expunged his record. *Id.* at 107-08 & n.4.

Although the formal entry of judgment was absent, the *Dickerson* court held that the guilty plea constituted a conviction, as a matter of federal law, for purposes of disabling this individual from owning a firearm. The Court reasoned that there was a charge of the disqualifying type; a guilty plea to the charge; and a court order of probation. Reasoning further, the Court explained that a guilty plea "differs in purpose and effect from a mere admission or an extrajudicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence." *Id.* at 111–13. The historical fact of conviction did not change with the state court's later expungement order. *Id.* at 114–15.

The same reasoning applies here. Lopez was charged with a felony in Texas; he pleaded guilty; and the state court deferred adjudication and placed him on probation. Therefore, Lopez has a prior conviction for purposes of § 841(b)(1)(A)(viii). *See Dickerson*, 460 U.S. at 111–15.

Our case law bolsters this conclusion. Relying on *Dickerson*, we have held that a guilty plea under Illinois' first-time-offender law, 720 ILCS 570/410 qualifies as a "prior conviction" under § 841(b)(1). *See, e.g., United States v. Graham*, 315 F.3d 777, 783 (7th Cir. 2003). In *Graham*, for example, we upheld a sentence of mandatory life in prison under § 841(b)(1)(B), where one of the predicate convictions was a finding of guilt for felony possession of a controlled substance and a sentence of two years of probation that was ultimately expunged. 315 F.3d at 783. Rejecting a challenge to the sentence, we held that "the fact that [the defendant] received probation that was later discharged does not alter the fact that he possesses a prior drug-related felony conviction qualifying him for the enhancement under § 841(b)(1)(B)." *Id*.

Our sister circuits are in accord. *See United States v. Pritchett*, 749 F.3d 417, 425 (6th Cir. 2014) (deferred adjudication under Tennessee law); *United States v. Craddock*, 593 F.3d 699, 701 (8th Cir. 2010) (per curiam) (deferred sentence under Missouri law); *Cisneros*, 112 F.3d at 1275 (deferred adjudication under Texas law); *United States v. Mejias*, 47 F.3d 401, 403-04 (11th Cir. 1995) (per curiam) (deferred adjudication under Florida law). The district court therefore did not err in counting Lopez's 1999 conviction as a predicate conviction to enhance his sentence under § 841(b)(1)(A)(viii).

**2.**

Lopez also argues that we should remand for resentencing because the district court violated § 851(b) by failing to inquire of him personally, prior to imposing sentence, "whether he affirms or denies that he has been previously convicted as alleged in the information," and likewise by failing to inform him that "any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." 21 U.S.C. § 851(b). The government does not dispute that the district court erred, but says that this error was harmless. We agree.

Lopez, who had notice from the government and the PSR that the government intended to seek an enhancement based on the 1999 guilty plea, never disputed the factual existence of the plea. In fact, his trial and appellate briefs acknowledge it and so did his counsel at oral argument. Lopez instead challenges the legal status of the 1999 guilty plea, arguing that it cannot qualify as a "conviction" under § 841(b)(1)(A)(viii). He also argued below that his counsel for the plea gave him faulty advice about the collateral consequences of pleading guilty. Either way, these are legal challenges that have no nexus to the district court's error and would not have been affected by a proper § 851(b) colloquy.[3] The challenge fails.

---

[3] To the extent Lopez asks us to construe his challenge as one to the factual (not legal) existence of his prior conviction, we decline to do so. Not only is it clear that Lopez challenges the legal status of his prior conviction, but also he made no such objection to its factual existence below, and thus the argument is "waived unless good cause be shown for failure to make a timely challenge." 21 U.S.C. § 851(c)(2). Lopez does not attempt to show good cause.

*See United States v. Williams*, 298 F.3d 688, 692–93 (7th Cir. 2002).

Although we find harmless error, we emphasize that the availability of the harmless error analysis is not a license to skirt mandatory procedures. We remind district courts to follow the detailed procedures set forth in § 851 to ensure the integrity and fairness of the sentencing process. This is not our first time saying this. *See, e.g.*, *Arreola-Castillo*, 889 F.3d at 387 (stating that compliance with § 851(b) "is necessary because 'it is always possible that the government was mistaken and there was no prior conviction, or that the facts alleged in the government's information of prior conviction are incorrect'") (quoting *United States v. Arango-Montoya*, 61 F.3d 1331, 1339 (7th Cir. 1995)). We also remind counsel, including the government, of its obligation to object when a district court fails to follow proper sentencing procedures prior to enhancing a sentence.

**3.**

Lopez finally argues that the district court's "application of the recidivist sentencing enhancement ran afoul of due process and government policy." This argument merits little discussion. Lopez reiterates his procedural objections without connecting them to due process and further attacks the government for its exercise of prosecutorial discretion in seeking a sentencing enhancement. Not only did Lopez fail to raise this argument below, and makes no attempt to show plain error, but his argument is merely an expression of his discontent with his mandatory life sentence, which is severe but not a violation of due process. *See United States v. Franklin*, 547 F.3d 726, 735 (7th Cir. 2008) ("mandatory minimum sentences are not a violation of a defendant's due process rights").

### III. Conclusion

For the foregoing reasons, Lopez's conviction and sentence are AFFIRMED.